UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x

In re Application of
CHEVRON CORPORATION
for an Order Pursuant to 28 U.S.C. § 1782
to Conduct Discovery from MCSquared PR,
Inc. for Use in Foreign Proceedings,

              Petitioner.

-------------------------------------------------------------x

14 MISC 00392

No. _____



**MEMORANDUM OF LAW IN SUPPORT OF PETITION AND APPLICATION FOR AN
ORDER PURSUANT TO 28 U.S.C. § 1782 TO CONDUCT DISCOVERY FROM
MCSQUARED PR, INC. FOR USE IN FOREIGN PROCEEDINGS**

GIBSON, DUNN & CRUTCHER LLP
RANDY M. MASTRO
ANDREA E. NEUMAN
ANNE CHAMPION
200 Park Avenue
New York, NY  10166-0193
Telephone:    212.351.4000
Facsimile:    212.351.4035

*Attorneys for Petitioner Chevron
Corporation*

# TABLE OF CONTENTS

Page

I. INTRODUCTION ............................................................................................... 1

II. FACTUAL BACKGROUND ............................................................................. 3

    A.    The Lago Agrio Litigation ..................................................................... 3

            1.    The Lago Agrio Plaintiffs Commit Fraud ................................ 4

            2.    The Obstruction Campaign ....................................................... 5

            3.    The Pressure Campaign and Collusion with the ROE ............... 6

            4.    The Ghostwriting of the Ecuadorian Judgment ....................... 8

    B.    MCSquared's Involvement in Pressuring Chevron and Promoting
        Enforcement of the Ecuadorian Judgment ......................................... 10

            1.    The ROE Engages MCSquared ............................................... 10

            2.    MCSquared's Activities .......................................................... 11

            3.    MCSquared's Efforts to Conceal Its Retention by the ROE.................. 14

    C.    The Lago Agrio Plaintiffs' Enforcement Campaign............................. 16

    D.    The Gibraltar Proceedings .................................................................. 17

III. ARGUMENT ................................................................................................. 19

    A.    The Requested Discovery Meets the Statutory Requirements of Section 1782 .. 19

            1.    MCSquared Is Found Within this District ............................... 20

            2.    The Discovery Sought Is Intended for Use Before Foreign Tribunals .... 20

            3.    Chevron Is an Interested Person ............................................. 21

            4.    The Discovery Sought Is Not Privileged ................................. 21

    B.    Discretionary Factors Also Favor the Requested Discovery ............... 22

            1.    MCSquared Is Not a Party to the Foreign Proceedings ........................... 23

            2.    The Foreign Tribunals Are Receptive to Federal Court Assistance
               Under Section 1782.................................................................. 23

**TABLE OF CONTENTS**
*(cont.)*

Page

        3.    Chevron Is Not Attempting to Circumvent Foreign Proof-Gathering Restrictions ........................................................................... 25

        4.    The Discovery Is Neither Unduly Burdensome Nor Intrusive ............... 25

   C.    The Information Sought Is Relevant and Therefore Presumptively Discoverable Under Section 1782 ...................................................................... 26

        1.    The Information Is Relevant to Whether the ROE Has Promoted Enforcement of the Judgment ................................................................. 27

        2.    The Information Is Relevant to Whether the ROE Has Provided Financial Support to the Lago Agrio Plaintiffs ........................................ 28

        3.    The Information Is Relevant to Whether the ROE Is Tampering with Witnesses ................................................................................................ 29

IV. CONCLUSION .................................................................................................................. 30

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Calvin Klein Trademark Trust v. Wachner*,
  198 F.R.D. 53 (S.D.N.Y. 2000)................................................................................... 21

*Chevron Corp. v. 3TM Consulting, LLC*,
  No. 4:10-mc-00134 (S.D. Tex. Apr. 5, 2010) ....................................................... 25

*Chevron Corp. v. Champ*,
  Nos. 1:10-mc-27, 1:10-mc-28, 2010 WL 3418394 (W.D.N.C. Aug. 30, 2010) ..................... 27

*Chevron Corp. v. Donziger*,
  974 F. Supp. 2d 362 (S.D.N.Y. 2014) ........................................................................ 2

*Chevron Corp. v. Page*,
  No. RWT-11-1942 (D. Md. Aug. 31, 2011)................................................................ 22

*Chevron Corp. v. Salazar*,
  275 F.R.D. 437 (S.D.N.Y. 2011)................................................................................ 22

*Chevron Corp. v. Stratus Consulting, Inc.*,
  No. 10-cv-00047-JLK (D. Colo.) (Mar. 4, 2010) ..................................................... 25

*Daimler AG v. Bauman*,
  134 S. Ct. 746 (2014)................................................................................................. 20

*Euromepa S.A. v. R. Esmerian, Inc.*,
  51 F.3d 1095 (2d Cir. 1995) ..................................................................................... 23

*In re Application for an Order for Judicial Assistance in a Foreign Proceeding in the
  Labor Court of Brazil*,
  466 F. Supp. 2d 1020 (N.D. Ill. 2006)...................................................................... 25

*In re Application of Chevron Corp.*,
  736 F. Supp. 2d 773 (S.D.N.Y. 2010) ...................................................................... 27

*In re Application of Chevron Corp.*,
  749 F. Supp. 2d 141 (S.D.N.Y. 2010) ...................................................................... 27

*In re Application of Inversiones y Gasolinera Petroleos Valenzuela, S. de R.L.*,
  No. 08-20378-MC, 2011 WL 181311 (S.D. Fla. Jan. 19, 2011)............................... 20

*In re Application of OOO Promnefstroy*,
  No. M 19-99 (RJS), 2009 WL 3335608 (S.D.N.Y. Oct. 15, 2009)..................... 23, 24

## TABLE OF AUTHORITIES
### *(cont.)*

Page(s)

*In re Application of Winning (HK) Shipping Co. Ltd.*,
   No. 09-22659-MC, 2010 WL 1796579 (S.D. Fla. Apr. 30, 2010) .......................................... 21

*In re Bayer AG*,
   146 F.3d 188 (3d Cir. 1998) ...................................................................... 3, 23, 25, 26

*In re Chevron Corp.*,
   709 F. Supp. 2d 283 (S.D.N.Y. May 6, 2010, as corrected May 10, 2010) ............................... 4

*In re Chevron Corp.*,
   Civil Nos. 10-MC-21JH/LFG, 10-MC-22 J/LFG, 2010 WL 9545704 (D.N.M. Sept. 13,
   2010) ........................................................................................................ 22

*In re Chevron Corp.*,
   No. 10-cv-1146-IEG (WMc), 2010 WL 3584520 (S.D. Cal. Sept. 10, 2010) ........................ 22

*In re Chevron Corp.*,
   Nos. 1:10-mc-00021-22, Dkt. 77 (D.N.M. Sept. 2, 2010) ............................................. 27

*In re Godfrey*,
   526 F. Supp. 2d 417 (S.D.N.Y. 2007) .................................................................... 20

*In re Grand Jury Subpoena Duces Tecum*,
   731 F.2d 1032 (2d Cir. 1984) ............................................................................. 22

*In re Heraeus Kulzer, GmbH*,
   No. 09-MC-00017, 2009 WL 2981921 (E.D. Pa. Sept. 11, 2009) ..................................... 23

*In re IPC Do Nordeste, LTDA, for an Order Seeking Discovery Under 28 U.S.C. 1782*,
   No. 12-50624, 2012 WL 4448886 (E.D. Mich. Sept. 25, 2012) ...................................... 24

*In re Oxus Gold PLC*,
   2007 WL 1037387 (D.N.J. Apr. 2, 2007) ................................................................ 23

*In re Roz Trading Ltd.*,
   Case No. 1:06-cv-02305-WSD, 2007 WL 120844 (N.D. Ga. Jan. 11, 2007) ......................... 23

*In re Strand Invs. Ltd.*,
   No. 09-21985-CIV, 2009 WL 2225536 (S.D. Fla. July 24, 2009) ..................................... 21

*Intel Corp. v. Advanced Micro Devices, Inc.*,
   542 U.S. 241 (2004) .......................................................................... 3, 20, 23, 25

*London v. Does 1-4*,
   279 F. App'x 513 (9th Cir. 2008) ......................................................................... 26

# TABLE OF AUTHORITIES
## (*cont.*)

Page(s)

*Pott v. Icicle Seafoods, Inc.*,
 945 F. Supp. 2d 1197 (W.D. Wash. 2013) ........................................................ 24

*United States v. Mejia*,
 655 F.3d 126 (2d Cir. 2011) ............................................................................. 21

*Wiwa v. Royal Dutch Petroleum Co.*,
 226 F.3d 88 (2d Cir. 2000) ............................................................................... 20

**Statutes**

22 U.S.C. § 611(c) ............................................................................................... 15

22 U.S.C. § 612(a) ............................................................................................... 15

22 U.S.C. § 615 .................................................................................................... 15

22 U.S.C. § 618 .................................................................................................... 15

28 U.S.C. § 1782(a) ............................................................................................... 1

28 U.S.C. §§ 1961 ................................................................................................. 2

**Other Authorities**

Fed. R. Civ. P. 30(b)(6).......................................................................................... 19

**Foreign Authorities**

Civil and Commercial Procedural Code, Art. 335 (Arg.)........................................ 17

Civil and Commercial Procedural Code, Art. 365 (Arg.).................................. 17, 24

Code of Civil Procedure, Art. 397 (Brazil).......................................................... 16

## I.   INTRODUCTION

Pursuant to 28 U.S.C. § 1782, Petitioner Chevron Corporation ("Chevron") respectfully applies to this Court for an order to conduct discovery from respondent MCSquared PR, Inc. ("MCSquared"), a public relations company incorporated in New York with offices in Manhattan and Brooklyn.  Section 1782 authorizes "[t]he district court of the district in which a person resides or is found [to] order him to give his testimony or statement or to produce a document or other thing for use in a foreign or international tribunal."  28 U.S.C. § 1782(a). MCSquared can be "found" here because it has an office in this district.  Ex. 59 at 2.

In 2013, MCSquared entered into a $6.4 million contract with the Republic of Ecuador ("ROE") to design and implement a multimedia anti-Chevron campaign.  Exs. 66–67.  The campaign was intended to promote enforcement of a $9.5 billion Ecuadorian judgment that this Court recently held was part of an illegal extortion scheme against Chevron.  Discovery from MCSquared will likely show collusion between the ROE and the Lago Agrio Plaintiffs ("LAPs") to enforce that judgment against Chevron and information relevant to any quid pro quo between the LAPs and the ROE relating to the Ecuadorian judgment.  Such evidence would be relevant to ongoing proceedings brought by the LAPs in Brazil and Argentina to enforce the judgment (the "Enforcement Proceedings") and Chevron's ongoing cases in the Supreme Court of Gibraltar against (1) Russell DeLeon, a major funder of the LAPs, his funding vehicle Torvia Limited, and Amazonia Recovery Limited, an entity created to collect and distribute the proceeds of the judgment and (2) against Woodsford Litigation Funding Limited, another major funder of the LAPs (collectively, the "Gibraltar Proceedings").

This Court has already found that the $9.5 billion Ecuadorian judgment was part and parcel of an extortion scheme against Chevron—masterminded by Steven Donziger, the lead U.S. lawyer for the LAPs—that violated the Racketeer Influenced and Corrupt Organizations

Act, 28 U.S.C. §§ 1961 *et seq*. ("RICO").  Among other things, the Court found that the conspirators ghostwrote the Ecuadorian judgment and bribed an Ecuadorian judge to issue it. *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 501–02 (S.D.N.Y. 2014) ("RICO Decision").  The Court also found that the conspirators colluded with the ROE to bring criminal indictments against Chevron lawyers in Ecuador (*id.* at 448–52) and engaged in an "expansive media campaign" to disseminate misrepresentations about Chevron and its purported environmental liability, all in an effort to pressure Chevron to pay billions.  *Id.* at 542.

MCSquared has paid celebrities to travel to Ecuador and publicly denounce Chevron for its refusal to pay the Ecuadorian judgment.  It has organized anti-Chevron protests for which it has recruited "extras" to pose as protestors.  Circumstantial evidence suggests that MCSquared may also be responsible for a series of interrelated anti-Chevron websites and social media accounts, including one called "The Nation's Traitors" that, in the style of a "most wanted" list, brands as traitors Ecuadorian lawyers and witnesses for Chevron in the RICO trial and other proceedings.  These websites and social media accounts have been used to disseminate anonymous anti-Chevron, pro-LAP, and pro-ROE messages.  MCSquared's activities appear to have been coordinated with the LAPs, whose representatives have appeared at MCSquared's protests, and whose agents have disseminated MCSquared's messages.

The full extent of MCSquared's work for the ROE is not yet known because MCSquared has gone to great lengths to conceal its relationship with the ROE.  MCSquared failed to register under the Foreign Agents Registration Act ("FARA") when it was retained by the ROE in 2013.  When the press revealed that MCSquared had paid extras to act as protestors at anti-Chevron protests, persons connected to MCSquared deleted references to the ROE from their social media accounts.  MCSquared then filed a registration statement and disclosed its contract with the

ROE. That contract showed that the ROE had paid MCSquared an unprecedented $6.4 million

for just one year of work, dwarfing any previous contract the ROE has had for lobbying or PR

work in the U.S., and eventually prompted investigations in Ecuador of the MCSquared contract.

*See, e.g.*, Ex. 138.

Chevron meets the requirements for discovery under Section 1782. *See, e.g.*, *Intel Corp.*

*v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 249, 264–65 (2004). As a party to the foreign

proceedings, Chevron is an "interested person," and the discovery sought, which relates to public

relations activities, is not privileged. The courts for which the discovery is sought are receptive

to it and the discovery is not otherwise available in the foreign proceedings themselves. Finally,

the discovery sought here is not unduly burdensome because Chevron has narrowly focused its

requests on information relevant to the foreign proceedings in question. Moreover, where, as

here, the information sought is relevant, it is "presumptively discoverable" under Section

1782. *In re Bayer AG*, 146 F.3d 188, 196 (3d Cir. 1998).

Chevron thus respectfully requests that this Court grant its petition for document and

deposition discovery from MCSquared pursuant to Section 1782.

## II.    FACTUAL BACKGROUND

The background of the underlying dispute between Chevron and the LAPs is set forth in

this Court's RICO Decision. *See* RICO Decision at 386–401. For the convenience of the parties

and the Court, Chevron briefly recounts that background here.

### A.    The Lago Agrio Litigation

In 2003, a group of U.S. and Ecuadorian lawyers filed a suit in Lago Agrio, Ecuador,

seeking damages from Chevron for purported environmental damage caused by Texaco

Petroleum Company's ("TexPet") oil operations in Ecuador (the "Lago Agrio litigation").

Chevron never operated in Ecuador, but had acquired Texaco in 2001. Texaco's subsidiary,

3

TexPet, had participated in an oil production consortium with Petroecuador, the ROE's state-owned oil company, until 1992.  RICO Decision at 386.  TexPet conducted a remediation of its minority share of the oil facilities as part of its transfer of full ownership to Petroecuador in 1992, and in return, the ROE and Petroecuador released TexPet from all liability for any claims arising out of the consortium's operations (the "final settlement and release").  *Id.* at 386–87. Petroecuador agreed to remediate the remaining sites, but did not begin that effort until more than a decade later.  Ex. 139.

### 1.    The Lago Agrio Plaintiffs Commit Fraud

Once the Lago Agrio litigation began, the LAPs resorted to fraud.  They forged the reports of their own expert, Charles Calmbacher, when he told them he was not finding evidence of harmful contamination at the oil production sites he inspected.  As Calmbacher testified when shown a report the LAPs submitted to the Ecuadorian court in his name, "I did not reach these conclusions and I did not write this report."  Ex. 7 at 116:9–10.

The LAPs then blackmailed the presiding judge to appoint a single "neutral" damages expert, Richard Stalin Cabrera Vega ("Cabrera"), whom the plaintiffs had hand-picked.  As Donziger said, the damages expert would "totally play ball with us and let us take the lead while projecting the image that he is working for the court."  Ex. 8 at DONZ00027256.  Chevron later obtained outtakes from *Crude*, a film about the case solicited and backed by the LAPs' team but marketed as a "documentary."  Those outtakes showed, among other things, Donziger and other attorneys and consultants for the LAPs meeting with Cabrera to plan his expert report just before the Ecuadorian court announced his appointment.  *See In re Chevron Corp.*, 709 F. Supp. 2d 283, 287, 289 (S.D.N.Y. May 6, 2010, as corrected May 10, 2010); RICO Decision at 422–27.  The conspirators acknowledged that they—and not Cabrera—would write his report.  As the LAPs' lead Ecuadorian attorney, Pablo Fajardo, stated on film, "the work isn't going to be the expert's."

4

Exs. 9–10 at CRS-191-00-CLIP-03, CRS-187-01-CLIP-02; RICO Decision at 425.

The LAPs secretly hired Stratus Consulting, a Colorado consulting firm, to draft Cabrera's report, while paying Cabrera under the table to pretend he was doing the work and to submit the report in his name. As this Court recognized, "it is clear that Donziger had the final word on every annex [appendix] and every piece of the [Cabrera] report." RICO Decision at 440. All the while, the LAPs concealed their activities from Chevron, repeatedly representing to the Lago Agrio court that Cabrera was "independent" and that Chevron's allegations that the LAPs were colluding with him were "an insult." Ex. 16; RICO Decision at 447. On April 1, 2008, Cabrera filed his ghostwritten report, concluding that Chevron should be held responsible for more than $16 billion in damages. RICO Decision at 442; Ex. 11 ¶¶ 3a, 8–19; Ex. 12 at 2165:2–8, 3833:3–3834:6, 2433:8–14; *see also* Exs. 13–15.

The LAPs filed objections to their own ghostwritten "Cabrera" report, criticizing it as "unjustly favorable to" Chevron. Ex. 17 at 40. They then ghostwrote a supplemental report that Cabrera submitted, raising the damages assessment to $27 billion. Exs. 18–20. And they bribed Cabrera to maintain the secret. *See* Exs. 21–36; Ex. 12 at 2137:9–16, 4503:22–4505:11, 3783:6–3784:25, 4847:2–24, 4853:6–4859:7, 4848:11–4849:11, 4860:20–4862:4, 4869:24–4878:12, 4883:10–4888:11; RICO Decision at 467, 559–60, 591–93.

### 2.     The Obstruction Campaign

In the fall of 2009, Chevron sought discovery pursuant to Section 1782 from Stratus in the District of Colorado. Recognizing that the exposure of the Cabrera plot was imminent, one of the LAPs' Ecuadorian lawyers emailed the team that if the truth about Cabrera emerged, they would all "go to jail." Ex. 37. In response, the LAPs' counsel attempted to obstruct the Stratus 1782 proceeding. They submitted misleading testimony and withheld documents while attempting to "cleanse" the record in Ecuador. They submitted new damages reports that would

restate the opinions in the Cabrera report, so that the Ecuadorian court would not have to rely on

the Cabrera report (the only evidence of causation and damages permitted during the proceeding)

in its judgment. This Court found these activities constituted obstruction of justice. RICO

Decision at 480–81, 593–94; Ex. 38; Ex. 39 at 71:6–72:16. *See also, e.g.*, Ex. 40 at 140:21–

141:11, 171:18–172:3, 225:6–25; Ex. 41 at 63:3–9, 68:21–69:4, 59:20–60:2; Ex. 42 at 114:8–19,

224:20–225:20, 276:8–20; Ex. 43 at 52:2–10.

### 3.    The Pressure Campaign and Collusion with the ROE

Donziger engaged in a broad "campaign" against Chevron intended to create "pressure …

to get the price up" and induce Chevron to settle the Lago Agrio litigation for billions of dollars.

RICO Decision at 582. This campaign included the spread of falsehoods through the media as

well as efforts to have Chevron "investigated" by governmental entities. The LAPs found a

willing ally in the government of Ecuador.

The ROE and the LAPs' representatives had long been in collusion. Indeed, before the

Lago Agrio litigation was filed, the ROE and Petroecuador struck a deal with the LAPs' lawyers,

who agreed not to sue or seek any recovery from the ROE or Petroecuador in exchange for their

support of the LAPs' claims against Chevron. Ex. 6; RICO Decision at 390. But the collusion

expanded when Rafael Correa was elected President of Ecuador in 2006. Donziger called

Correa's election a "new dawn," stating that their "friends" were now in office. Exs. 9–10 at

CRS145-02-CLIP 01, CRS139-03-CLIP 01. Donziger bragged that the Correa administration

"love[s] us and they want to help us," and argued that they should "take advantage" of the

relationship in order to further pressure Chevron. RICO Decision at 449; Exs. 9–10 at CRS138-

01-CLIP 01, CRS139-03-CLIP 01.

Just over two months after his inauguration, President Correa met with the LAPs' legal

team and "pledged his full support" to them. RICO Decision at 449, 616; Ex. 44. As the LAPs'

representatives' lobbyist reported, President Correa "GAVE US FABULOUS SUPPORT.  HE EVEN SAID HE WOULD CALL THE JUDGE."  RICO Decision at 449, 616; Ex. 45 (emphasis in original).  President Correa toured the former Consortium area with members of the LAPs' legal team and called for criminal charges against the Petroecuador officers who approved the settlement and release of TexPet.  RICO Decision at 616; Ex. 46.  The LAPs then lobbied Correa to pursue criminal charges against the TexPet attorneys who were involved in the settlement and release agreements, to "force [Chevron] to the table for a possible settlement."  RICO Decision at 586; Exs. 9–10 at CRS221-02-CLIP01; Ex. 8 at DONZ00036266; Ex. 47.  Multiple prosecutors had already investigated the settlement and release agreements and found no evidence supporting criminal charges, but, under President Correa, the ROE nonetheless filed criminal charges against two former TexPet attorneys, only to drop the charges after the $18 billion Ecuadorian judgment was issued.  RICO Decision at 450–52.

President Correa has also spoken out about how he "really loathe[s] the multinationals," (RICO Decision at 451), and labeled Chevron "the monster," alleging it is an "unethical, unscrupulous multinational company" that "is trying to destroy Ecuador" (Ex. 81; Ex. 95).  He has called Chevron an "enemy of our country" and its Ecuadorian attorneys "homeland-selling lawyers" (*vendepatrias*).  RICO Decision at 452, 616; Exs. 48–49.

At the same time, Correa has claimed that accusations of collusion between the ROE and the LAPs are "totally unfounded" and that "it must be well understood that this is a dispute between private parties, a lawsuit between private parties."  Ex. 81 at 17–18 of 19.  He has claimed that "if the State must participate, it's to defend ourselves, uh, against the systematic attack, uh, against the attack, really, uh, orchestrated by Chevron against the government of Ecuador."  *Id.*  The ROE's attorneys have stated in the course of ongoing arbitration between

Chevron and the ROE regarding, *inter alia*, the ROE's failure to honor its obligations under the final settlement and release agreements, *see* Ex. 56, that "there is no coordination among the Plaintiffs and the Republic as to any public relations campaign against Chevron. Period. It is not happening and the Claimants' allegations in this regard continue to be irresponsible and unsupported." Ex. 210.

### 4.    The Ghostwriting of the Ecuadorian Judgment

On February 14, 2011, the Ecuadorian court issued a judgment for $18 billion in damages against Chevron, including an $8.6 billion "penalty" for Chevron failing to publicly "apologize." RICO Decision at 481; Ex. 50.[1]  Despite the evidence of fraud, collusion, bribery, and ghostwriting related to the Cabrera report, the Ecuadorian court relied on aspects of it in the judgment. RICO Decision at 481–82; RICO Appendix at 54. President Correa praised the judgment as "historic." RICO Decision at 616; Ex. 51.

Chevron soon discovered that the judgment appeared to have been ghostwritten by the LAPs' team. As this Court later found, at least eight documents from the LAPs' internal files (documents Chevron obtained in other Section 1782 proceedings), which "appear nowhere in the Lago Agrio court record," including errors, typos, and other idiosyncrasies, "appear *in haec verba* or in substance in the Judgment," like "fingerprints." RICO Decision at 492–98; Exs. 52–55; Ex. 11.

The purported author of the Ecuadorian judgment, Judge Nicolas Zambrano, testified on behalf of the LAPs during the RICO trial. Judge Zambrano insisted that he wrote every word of the judgment, with no assistance from anyone except a teenage typist. But he was unable to recall the most fundamental aspects of the 188-page opinion. For example, he was unable to

---

[1]  Ecuador's National Court of Justice later eliminated the penalty, reducing the judgment to $9.5 billion. Exs. 57–58.

explain how he had come to cite legal authorities in foreign languages that he did not even speak. He could not explain the meaning of the English word "workover," although the word appears repeatedly in the judgment. He could not explain the meaning of TPH ("total petroleum hydrocarbons"), mentioned dozens of times in the judgment and the basis for most of the damages award. Most significantly, he was unable to explain the overlap between the judgment and the LAPs' internal work product. Although the LAPs claimed the overlap could be explained by purported informal, undocketed submissions to the court, Judge Zambrano testified that he checked all submissions to the court to make sure they were reflected in the record before relying on them. This Court concluded that Judge Zambrano "did not write the Judgment issued under his name. He was astonishingly unfamiliar with important aspects of its contents. His testimony at trial was evasive and internally inconsistent." RICO Decision at 491.

After examining voluminous evidence and oral and written testimony given at trial by multiple witnesses, this Court made further findings regarding the ghostwriting scheme. The Court found that another former Ecuadorian judge, Alberto Guerra, testified and provided documentary evidence, including bank records, and that he had acted as Judge Zambrano's ghostwriter for years. He had been paid by the LAPs' team to draft orders in their favor until he was tasked by Judge Zambrano with soliciting a bribe to draft a final judgment in their favor. This Court found that Donziger and the LAPs bribed Zambrano to rule against Chevron and to ghostwrite the $9.5 billion judgment: "(a) Zambrano agreed with Fajardo to fix the case for a payment of $500,000 paid out of any judgment proceeds, (b) Fajardo did so with Donziger's express authorization, (c) the LAPs drafted all or most of the Judgment, and (d) Zambrano signed their draft without consequential modification as part of the *quid pro quo* for the promise of $500,000." *See* RICO Decision at 534–35.

9

**B.      MCSquared's Involvement in Pressuring Chevron and Promoting Enforcement of the Ecuadorian Judgment**

**1.      The ROE Engages MCSquared**

Despite the evidence of ghostwriting and bribery, the ROE has doubled down on its campaign against Chevron, and its support for the LAPs and enforcement of the Ecuadorian judgment.  To that end, it engaged MCSquared, a company incorporated in New York in 2013, to design and implement a public relations strategy against Chevron.

MCSquared's principals are Ecuadorian citizens living in New York with close ties to the Correa administration.  Ex. 2 at 1.  MCSquared's CEO, founder, and sole shareholder is Maria del Carmen Garay, the wife of a former ROE official, Danilo Roggiero.  Ex. 125; Ex. 59 at 2; Ex. 61.  Prior to forming MCSquared in 2013, Garay worked as an executive assistant and personal trainer.  Exs. 125, 134.  Roggiero has served as the vice consul for the Ecuadorian consulate in Connecticut and as head of the Ecuadorian Secretariat for Migrant Affairs ("SENAMI") for the U.S. and Canada.  Ex. 62.  Two months prior to the signing of the MCSquared contract, Roggiero left SENAMI to start a media company.  Ex. 2 at 7, 9, 17; Ex. 162.  Roggiero appears to have a close relationship with Fernando Alvarado, the head of Ecuador's Secretariat of Communications.  *See, e.g.*, Ex. 158.  According to the MCSquared contract, Alvarado requested President Correa's approval to enter into the contract.  Ex. 66 at 8–9 of 33.

MCSquared's communications advisor is Jean-Paul Borja (Ex. 59 at 2), who has also worked as a correspondent for the Ecuadorian state-run newspaper *El Ciudadano*.  Ex. 63 at 5; Ex. 64.  Cynthia Zapata Solis, who previously worked for the Ministry of the Environment in Ecuador, and Rafael Rosero, who was born in Ecuador and is now a U.S. citizen, have also worked at MCSquared.  Ex. 59; Ex. 63 at 5; Ex. 65; Ex. 129.

The contract between the ROE and MCSquared was executed by Ecuador's Ambassador to the U.S., Nathalie Cely Suárez, on May 1, 2013, shortly after MCSquared was incorporated. The contract provides that the ROE would pay MCSquared $6.4 million over a year for services including "conduct[ing] studies and formulat[ing] strategies of communication, information, image and communication publicity at an international level." Ex. 66 at 8–9, 19 of 32; Ex. 67; Ex. 133 at 16. This sum dwarfs other contracts into which the ROE has entered for public relations and lobbying. Indeed, of the $10,426,999 in fees the ROE paid to various U.S. public relations and lobbying firms from 2009 to 2014, more than 60% of those fees went to MCSquared for a year-long contract. *See* Ex. 116.

### 2.  MCSquared's Activities

Although the full extent of MCSquared's involvement is not yet known, it appears to be behind a multilateral anti-Chevron PR campaign intended to lend legitimacy to the Ecuadorian judgment and attack witnesses who have provided testimony for Chevron. MCSquared appears to have orchestrated a PR campaign styled the "Dirty Hand of Chevron" campaign, announced in late 2013 in a speech by President Correa, in which he accused Chevron of "trying to break the country." Ex. 69 at 4. The campaign includes websites *www.thedirtyhand.com*, and its Spanish equivalent, *www.lamanosucia.com*, which promote Ecuador's "$10 billion struggle against Chevron." *See* Ex. 70.

A series of seemingly separate but closely coordinated anti-Chevron websites and social media accounts appeared around the same time and circumstantial evidence indicates that MCSquared is behind these sites as well as the "Dirty Hand" sites. Indeed, President Correa has unintentionally corroborated this in defending the size of MCSquared's contract by stating that the ROE did not pay "$1–$1.2 million for *a website*," but for "*a series of products*." Ex. 95 at 3 (emphases added). These websites, Twitter, and Facebook accounts include Apoya al Ecuador

(Support Ecuador), Chevroff, Toxic Effect, La Mano Sucia (The Dirty Hand), and Los Vende Patria (The Nation's Traitors).[2] All five websites share content and are directly connected to the ROE through the Justice for Ecuador website, to which MCSquared linked in two full-page, anti-Chevron advertisements it purchased in *The Washington Post* and the *San Francisco Chronicle* in August of 2013. *See* Ex. 59 at 7; Ex. 106; Ex. 124. The advertisements stated, "Issued by the Government of Ecuador," and linked to JusticeforEcuador.com. Ex. 106; Ex. 124. That website, in turn, was registered on the same day as the website for Toxic Effect, and the Justice for Ecuador's "About" page links to Chevroff's Facebook page. Exs. 107–108; Ex. 97.

As part of the campaign, MCSquared has arranged for various celebrities to visit Ecuador at the ROE's expense and tour oil fields purportedly representing pollution left by Chevron, dipping their hands in crude oil to symbolize the "Dirty Hand." These trips were followed by press releases denouncing Chevron and an article in *El Ciudadano* by MCSquared's Jean Paul Borja titled "Celebrities and experts support Ecuador in its struggle against Chevron." *See* Exs. 64, 71–73, 75–78. MCSquared later disclosed in FARA filings that it paid more than half a million dollars for actors Mia Farrow and Danny Glover to make such appearances. Ex. 131; Ex. 132. MCSquared arranged similar trips for Gayle McLaughlin, the mayor of Richmond, California (where Chevron is located), activist Alexandra Cousteau, and "Calle 13," a popular Latin American band. *See* Exs. 71–73, 75–78.

MCSquared also appears to have organized a series of anti-Chevron "protests." For example, MCSquared organized a "Rally for Justice in Ecuador" in Foley Square, across from the Southern District courthouse on the opening day of the RICO trial, October 15, 2013. Ex. 79.

---

[2] The websites for Chevroff and Toxic Effect were both registered anonymously, within days of each other, through the same Panamanian entity. Exs. 96–97. The websites for The Dirty Hand, The Nation's Traitors, and Apoya al Ecuador were similarly registered anonymously, to a single entity in Scottsdale, Arizona. Exs. 98–101.

Javier Piaguaje, one of the LAPs, attended the rally and Amazon Watch and other allies of the LAPs promoted it. Ex. 80.

Days later, Correa announced that he would publicize the names of individual Ecuadorians who had worked for Chevron: "We are giving the names of people who are on Chevron's side so that the Ecuadorian people will know when one of these pseudo-analysts is speaking, it is really Chevron's attorney who is speaking." Ex. 81 at 2. Correa called Chevron and anyone who would aid Chevron "traitors," "criminals," and "enem[ies] of the country" who are "conspir[ing] against the Government," "giving ammunition to [Ecuador's] international enemies," and waging a "criminal campaign" against Ecuador. Ex. 49; Ex. 82; Ex. 83. Coinciding with Correa's statements, "The Nation's Traitors" (Los Vende Patria, *www.losvendepatria.com*) website published a "most wanted" style list of Ecuadorian attorneys and witnesses who "cooperated with American multi-national Chevron," branding them traitors. Ex. 84.

After this Court issued judgment in the RICO case in March 2014, MCSquared orchestrated a protest at Chevron's annual shareholder meeting in Midland, Texas. Ex. 85. That protest was attended by one of the LAPs' representatives, Humberto Piaguaje, and extras were paid $85 a day to pose as protestors. *See* Ex. 85.[3] MCSquared also appears to have spent $200,000 on a Twitter hashtag campaign to promote this event. The hashtag—#AskChevron— was then used by several persons associated with the LAPs and the ROE—including Ambassador Cely and Simon Billenness, a longtime support of the LAPs'—before it was even released by Twitter on May 28, demonstrating their foreknowledge. It was also used by the Twitter accounts @Chevroff, @ToxicEffect, and @Apoya al Ecuador (Support Ecuador). Exs.

---

[3] DFLA has worked on other MCSquared-created anti-Chevron campaign events over the last year. *See* Exs. 102–105.

88–94.

MCSquared also appears to have organized a May 21, 2014 "protest" in Union Square, part of the purportedly international "International Anti-Chevron Day," promoted by both the ROE and outlets affiliated with the LAPs, including Amazon Watch. Exs. 109–111. "Extras" and "principal talent" were recruited and paid $80–$200 to appear at the protest. Ex. 109. This and other "International Anti-Chevron Day" protests were promoted through Twitter accounts including @Apoya al Ecuador and @Chevroff. Exs. 112–113.

### 3. MCSquared's Efforts to Conceal Its Retention by the ROE

MCSquared's activities at Chevron's annual shareholders' meeting in Midland, Texas drew media scrutiny, in particular, its hiring of "extras" to act as protestors, which was confirmed by the LAPs' own spokesperson, Karen Hinton. Ex. 85. Once its role was exposed, MCSquared took steps to obfuscate and deny its connection to the ROE. Even though Borja had admitted weeks earlier that the ROE "is a client of [MCSquared]," MCSquared's CEO, Garay, refused to disclose whether MCSquared represented the ROE. Ex. 64; Ex. 114; Ex. 115. Instead, she "insisted that MCSquared's work . . . was undertaken pro bono on behalf of the indigenous Ecuadorians who attended." Ex. 64.

MCSquared's principals also began deleting references to the ROE in their social media profiles and feeds. On June 3, 2014, for example, Garay removed a reference to her husband, Danilo Roggiero (former head of the Ecuadorian Secretariat for Migrant Affairs) from her Twitter profile, as well as a reference to herself as an "EcuaYorker." Exs. 125–126. Garay also deleted a series of tweets and photographs of the Midland "protest." Ex. 127. She deleted her Facebook profile in its entirety. Ex. 128. And Cynthia Zapata Solis deleted her LinkedIn profile, which had listed her position with MCSquared. Exs. 129–130.

The public exposure of MCSquared work for the ROE also prompted it to register under

14

FARA, which requires persons and entities representing foreign governments within the United States to register with the U.S. government *prior* to acting on behalf of the foreign sovereign. *See* 22 U.S.C. §§ 612(a), 615.[4]  MCSquared's FARA registration statement, filed on July 3, 2014—over a year after it entered into a contract with the ROE, and amended on September 10, 2014 to "correct" omissions made in the original filing—disclosed that MCSquared had been working for the ROE since May 1, 2013.  Ex. 59; Ex. 66; Ex. 132.  The FARA filing publicly exposed the price tag, which caused a strong reaction in both the U.S. and Ecuadorian media. One article called the $6.4 million figure a "stunning figure in the niche business of foreign government lobbying."  Ex. 66; Ex. 67.  And MCSquared's FARA filings do not account for the entire $6.4 million, but only about $2 million worth of it in the form of disbursements to talent agencies, publications, and radio and television stations, $692,327 in expenditures for "Production – Multimedia," and $157,168.80 on "Tourism" events.  Ex. 132 at 4–5 of 65.

Even the disclosed disbursements are suspect.  For example, Farrow denied she had been paid the amount MCSquared claimed it paid her talent agency—$188,000.  After this figure was publicized, Farrow tweeted: "They paid my speaking fee – nowhere near that amount."  Ex. 141.

Ecuador's Comptroller General opened a "preliminary verification" to investigate the contract.  Ex. 117.  In response, President Correa has publicly stated, "[t]he Comptroller's Office is looking into this, there's an audit—which is good—and we're sure that everything is in order, right?  But we should be prudent in how things are managed because *one could even betray one's country, brothers and sisters*."  Ex. 95 at 3 (emphasis added).  As Correa explained,

---

[4]  The requirements of FARA extend to persons representing the interests of the foreign principal before any agency or official of the United States, engaging in political or public relations activities on behalf of the foreign principal, or soliciting, collecting, or dispensing contributions, loans, money, or other things of value on behalf of the foreign principal.  *Id.* § 611(c).  Willful failure to comply with FARA constitutes a felony.  *See id.* § 618.

MCSquared was not being used solely to "improve [the ROE's] international image;" rather, "there are things that can't be specifically stated in a contract. Let's move on." Ex. 136 at 2.

The Ecuadorian legislature is also investigating. A legislator told the press on October 13, 2014, that the MCSquared contract "smells like filth and corruption." Ex. 142. Garay, Alvarado, and Borja were called to provide statements, but none appeared.[5] Ex. 143.

## C.    The Lago Agrio Plaintiffs' Enforcement Campaign

As part of the ongoing scheme to extort Chevron, the LAPs have employed a "multi jurisdictional strategy" for enforcement of the Ecuadorian judgment intended "to leverage the expense, risks, and burden to Chevron of defending itself in multiple jurisdictions to achieve a swift recovery, most likely by precipitating a settlement." RICO Decision at 475 (internal quotation marks omitted).

On June 27, 2012, the LAPs filed an action against Chevron in the Superior Court of Justice in Brasilia, Brazil, for recognition of the Ecuadorian judgment. Ex. 123. Chevron opposed, providing the court with the evidence then at its disposal to support its arguments that the Ecuadorian judgment is not entitled to recognition, in part due to the interference of President Correa and the ROE in the underlying lawsuit because of the ROE's own interest in enforcement of the fraudulent judgment against Chevron. Champion Decl. ¶ 121. Chevron has since submitted several supplemental petitions to provide the Brazilian court with new evidence as it is obtained, which is permitted under Brazilian procedure. *See* Code of Civil Procedure ("CCP"), Art. 397 (Brazil).

On November 21, 2012, the LAPs filed an action to enforce the Ecuadorian judgment in

---

[5]  Alvarado has stated that he will not provide a statement until the investigation, which he personally requested, is complete, because, he claims, Ecuadorian law requires this. Ambassador Cely has also been called but has not appeared, taking the same stance as Alvarado and refusing to appear until the investigation is complete. Exs. 146; 205.

the National First Instance Civil Court in Buenos Aires, Argentina.  Champion Decl. ¶ 122.

Chevron has also opposed that action and submitted a significant volume of forensic and

documentary evidence supporting its argument that the Ecuadorian judgment is not entitled to

recognition and enforcement.  Champion Decl. ¶ 122–23.  Argentinian law permits parties to

submit new evidence as it is obtained.  Civil and Commercial Procedural Code ("CPCCN") Art.

365; *see also* CPCCN Art. 335 (permitting a party to file documents of which it was not

previously aware).

The merits phase of the Brazilian and Argentinian proceedings, when the courts will

consider the fraud allegations and evidence relating to the unfounded pressure campaign, is

approaching.  In addition, the LAPs "maintain a list of approximately 30 potential countries that

recognize foreign judgments and where Chevron has assets" and have vowed to file enforcement

actions in these countries "as necessary to ensure that the full amount of the judgment can be

satisfied."  Ex. 118 at 2.  Chevron thus also seeks discovery for potential submission in future

enforcement actions.

**D.     The Gibraltar Proceedings**

Russell DeLeon and his investment vehicle Torvia are the single largest funders of the

LAPs.  DeLeon has provided millions of dollars in funding to the LAPs—some of which went to

fund the Cabrera report—in exchange for a percentage of the proceeds of the Ecuadorian

judgment.  *See, e.g.*, RICO Decision at 453–454, 474, 477, 591–92.  On December 17, 2012,

Chevron filed a complaint before the Supreme Court of Gibraltar against DeLeon and Torvia for

unlawful means conspiracy and a conspiracy to injure, and unlawful interference with Chevron's

economic interests in connection with their ongoing involvement in the conspiracy to defraud

and extort Chevron.  Ex. 119.  Chevron alleged that DeLeon and Torvia knew or were willfully

blind to the commission of the numerous frauds in Ecuador and the United States in furtherance

of Donziger and the LAPs' scheme.  The Supreme Court of Gibraltar recently denied DeLeon

and Torvia's motion to dismiss following a five-day hearing by the court and its review of

thousands of pages of documents, many of which were obtained by Chevron in Section 1782

proceedings across the United States.  *See* Ex. 120 ¶¶ 3, 6, 41(ii) (noting the voluminous

information Chevron obtained in part through Section 1782 petitions).

    The court rejected defendants' claim that Chevron was launching an "impermissible

collateral attack upon the decisions of courts of competent jurisdiction in Ecuador."  *Id.* ¶¶ 44,

48.  The court noted that "[i]f the Appeal court in Ecuador had before it anything like the

evidence which has been put before me, it is indeed surprising on the face of it that at the least a

rehearing [on Chevron's fraud allegations in the Lago Agrio litigation] was not ordered" and that

"it is difficult to envisage how [Chevron] could properly and fairly have contested the [Lago

Agrio] proceedings if its allegations of wholesale corruption of the judiciary and Government [of

Ecuador] are true."  *Id.* ¶ 48(vi), (ix).  DeLeon and Torvia have recently filed their "Defence"

(comparable to an answer in the U.S.), to which Chevron filed a "Reply" on September 10, 2014.

Champion Decl. ¶ 124.  The pleadings phase of the case is now closed and the "Disclosure"

(discovery) process will follow.

    Chevron also has filed an action in Gibraltar against Amazonia Recovery Limited and

Woodsford Litigation Funding Limited.  Champion Decl. ¶ 120.  Amazonia is a Gibraltar

company formed for the purpose of soliciting and distributing litigation funding to support the

conspiracy and to distribute any enforcement proceeds.  Ex. 5 ¶ 4 (stating "Amazonia [Recovery

Limited] is a corporation that exists to enforce the Ecuadorian judgment against Chevron and to

distribute any funds recovered from that enforcement.").  Its board of directors is comprised of

some of the key members of the conspiracy, including LAPs' representatives Pablo Fajardo and

Luis Yanza. Ex. 4 at 3–4. Woodsford provided $2.5 million in funding to the conspirators in or around March 2013, including payments to Karen Hinton, one of the lead perpetrators of the public pressure campaign. Ex. 3 at 2528:10–2529:11. Chevron's action against Amazonia and Woodsford is still in its early stages and no responsive pleadings have been filed.[6]

## III.    ARGUMENT

Chevron seeks document discovery from MCSquared and a deposition pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure for use in the Enforcement Proceedings and the Gibraltar Proceedings. The information gathered by Chevron to date indicates that the ROE is using MCSquared to coordinate an anti-Chevron campaign to secure enforcement of the fraudulent Ecuadorian judgment. The ROE appears to be acting in concert with the LAPs in an effort to pressure Chevron to pay the Ecuadorian judgment. The ROE's MCSquared campaign is also intended to pressure those who speak out about the fraud underlying the Ecuadorian judgment or act on behalf of Chevron, including witnesses, lawyers, and experts who have testified for or provided services for Chevron. Chevron anticipates that discovery obtained from MCSquared will demonstrate the ROE's coordination with the LAPs, the ROE's involvement in funding the LAPs' activities, and the ROE and LAPs' intent to impact foreign enforcement proceedings. This is relevant to Chevron's claims in the foreign proceedings, in which the impartiality of Ecuador's courts, including their susceptibility to political pressure, is at issue.

## A.    The Requested Discovery Meets the Statutory Requirements of Section 1782

To obtain discovery under 28 U.S.C. § 1782, an applicant must satisfy statutory requirements. Discovery under Section 1782 may be had if it: (1) is directed at someone found within the District; (2) is intended for use before a foreign tribunal; (3) is based upon the

---

[6] The case against Amazonia and Woodsford has not yet proceeded to the responsive pleadings phase.

application of a person interested in the foreign proceeding; and (4) does not seek privileged materials. Chevron's present application satisfies these requirements.

### 1. MCSquared Is Found Within this District

MCSquared "resides or is found" in this District because it is incorporated in New York and has an office in Manhattan (at 121 Varick Street). Ex. 59 at 1. Courts have held that a corporation is "found" in a district when it would be subject to personal jurisdiction there. *See In re Applic. of Inversiones y Gasolinera Petroleos Valenzuela, S. de R.L.*, No. 08-20378-MC, 2011 WL 181311, at \*8 (S.D. Fla. Jan. 19, 2011). A corporation's place of incorporation is a "paradigm bas[is] for general jurisdiction" where "a corporate defendant may be sued on any and all claims." *Daimler AG v. Bauman*, 134 S. Ct. 746, 760 (2014) (internal citations and quotations omitted).

In addition, MCSquared's continuous and systematic contacts with Manhattan through the maintenance of an office here satisfy this requirement. *See In re Godfrey*, 526 F. Supp. 2d 417, 422 (S.D.N.Y. 2007) (noting that a corporation is "found" in a district where it conducts "systematic and continuous" activities); *see also Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 95 n.4, 98–99 (2d Cir. 2000) (holding that the presence of an investor relations office in New York City sufficed to confer jurisdiction). MCSquared has also availed itself of the protections of New York law by choosing it to govern MCSquared's contract with the ROE. Ex. 66 at 16.

### 2. The Discovery Sought Is Intended for Use Before Foreign Tribunals

The discovery Chevron seeks is for use in proceedings before foreign tribunals: the Enforcement Proceedings which the LAPs have filed and plan to file in multiple foreign jurisdictions, and the Gibraltar Proceedings. *See, e.g., Intel*, 542 U.S. at 258. Indeed, even if those proceedings were not ongoing, discovery is permitted for foreign enforcement proceedings that have not yet been filed. *See id.* at 258–59 (holding that "[S]ection 1782(a) does not limit the

provision of judicial assistance to 'pending' adjudicative proceedings" and "requires only that a dispositive ruling . . . be within reasonable contemplation"); *In re Applic. of Winning (HK) Shipping Co. Ltd.*, No. 09–22659–MC, 2010 WL 1796579, at *1 (S.D. Fla. Apr. 30, 2010) (granting § 1782 application for use in "proceedings that [Petitioner] *intended* to commence") (emphasis added).

### 3.      Chevron Is an Interested Person

As a party to the Gibraltar Proceedings and the Enforcement Proceedings (as well as potential enforcement actions), Chevron is an "interested person." *In re Strand Invs. Ltd.*, No. 09-21985-CIV., 2009 WL 2225536, at *1 (S.D. Fla. July 24, 2009) ("interested person" includes parties to international proceedings).

### 4.      The Discovery Sought Is Not Privileged

The requested discovery is not privileged.  MCSquared has acted as a public relations firm on behalf of the ROE and has no attorney-client relationship with the ROE. *Cf. United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011) ("The attorney-client privilege protects communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal advice.").  Chevron seeks documents and testimony related to such public relations activities, which are generally found to be non-privileged. *See, e.g., Calvin Klein Trademark Trust v. Wachner*, 198 F.R.D. 53, 55 (S.D.N.Y. 2000) (holding that documents disclosed to public relations firm were not privileged because firm did "not appear to have been performing functions materially different from those that any ordinary public relations firm would have performed."); *see also In re Applic. of Chevron Corp.*, 749 F. Supp. 2d 141, 163 (S.D.N.Y. 2010) (holding that Donziger could not assert privilege over public relations documents because "[c]ourts would have no hesitation in allowing otherwise appropriate discovery of lay lobbyists,

public relations consultants, media representatives, and political organizers.  There is no sound

reason for reaching a different result when someone with a law degree engages in similar

activities.").

Moreover, even assuming that any privilege applied, which it does not, the crime-fraud

exception would vitiate it as to any documents in MCSquared's control that were used to further

what this Court called a "pressure campaign premised on misrepresentations."  RICO Decision at

580.[7]  "It is well-established that communications that otherwise would be protected by the

attorney-client privilege or the attorney work product privilege are not protected if they relate to

client communications in furtherance of contemplated or ongoing criminal or fraudulent

conduct."  *In re Grand Jury Subpoena Duces Tecum*, 731 F.2d 1032, 1038 (2d Cir. 1984).  To

the extent MCSquared's services were used to try to extort a settlement from Chevron, such

evidence is not privileged.

## B.    Discretionary Factors Also Favor the Requested Discovery

The Supreme Court has also directed district courts to consider four additional factors

before exercising their discretion to grant a Section 1782 application:  (1) whether the person

---

[7]  Numerous other courts have also found that the crime-fraud exception to privilege applies to
documents related to the LAPs' fraudulent and extortionate scheme.  *See Chevron Corp. v.
Salazar*, 275 F.R.D. 437, 455 (S.D.N.Y. 2011) ("Chevron has thus carried its burden of
demonstrating that the crime-fraud exception applies to the creation of the Calmbacher
report, the Cabrera report, and the cleansing memos."); *In re Chevron Corp.*, Civil Nos. 10-
MC-21JH/LFG, 10–MC–22 J/LFG, 2010 WL 9545704, at *7 (D.N.M. Sept. 13, 2010)
(finding that "discussions trigger the crime-fraud exception, because they relate to corruption
of the judicial process, the preparation of fraudulent reports, the fabrication of evidence, and
the preparation of the purported expert reports by the attorneys and their consultants"); *In re
Chevron Corp.*, No. 10-cv-1146-IEG (WMc), 2010 WL 3584520, at *6 (S.D. Cal. Sept. 10,
2010) (upholding Magistrate Judge's application of crime-fraud exception because "[t]here is
ample evidence in the record that the [LAPs] secretly provided information to Mr. Cabrera,
who was supposedly a neutral court-appointed expert, and colluded with Mr. Cabrera to
make it look like the opinions were his own"); *Chevron Corp. v. Page*, No. RWT-11-1942,
Hearing Tr. at 11:2–24 (D. Md. Aug. 31, 2011) (applying crime-fraud exception to
documents held by LAPs' representative Aaron Page).

from whom discovery is sought is a party in the foreign proceeding; (2) the receptivity of the foreign tribunal to federal-court assistance; (3) whether the request conceals an attempt to circumvent foreign proof-gathering restrictions; and (4) whether the request is unduly intrusive or burdensome. *See Intel*, 542 U.S. at 264–65; *In re Heraeus Kulzer, GmbH*, No. 09-MC-00017, 2009 WL 2981921, at *2 (E.D. Pa. Sept. 11, 2009), *vacated on other grounds by* 390 F. App'x 88 (3d Cir. 2010); *In re Oxus Gold PLC*, 2007 WL 1037387, at *3 (D.N.J. Apr. 2, 2007). Although it is not necessary that all discretionary factors be met, as detailed below, each factor does weigh in favor of granting the requested discovery here.

### 1.    MCSquared Is Not a Party to the Foreign Proceedings

One discretionary factor is whether the party from which discovery is sought is a party to the foreign litigation at issue. *Intel*, 542 U.S. at 264; *In re Roz Trading Ltd.*, Case No. 1:06-cv-02305-WSD, 2007 WL 120844, at *2 (N.D. Ga. Jan. 11, 2007) ("Respondent is not a party to the arbitration, and on this ground alone the first *Intel* factor is satisfied."). MCSquared is not a party to any of the foreign proceedings for which this discovery is sought, nor can the evidence sought here be obtained in those tribunals. *Cf. Intel*, 542 U.S. at 264. This factor thus weighs in favor of granting this application.

### 2.    The Foreign Tribunals Are Receptive to Federal Court Assistance Under Section 1782

"Receptivity" is not a question of whether the foreign court would or could permit this particular discovery; instead, it is an inquiry into whether a foreign legal system would "*reject* evidence obtained with the aid of section 1782." *In re OOO Promnefstroy*, No. M 19-99 (RJS), 2009 WL 3335608, at *7 (S.D.N.Y. Oct. 15, 2009) (emphasis in original); *see also In re Bayer AG*, 146 F.3d 188, 196 (3d Cir. 1998); *Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1100 (2d Cir. 1995) (burden is on party opposing Section 1782 discovery to prove lack of receptivity).

To show lack of receptivity, a party must provide "authoritative proof" that the foreign tribunal

would reject the evidence sought under Section 1782. *See Promnefstroy*, 2009 WL 3335608,

at *7.  No such authoritative proof exists here.

Chevron has already submitted significant amounts of evidence obtained in Section 1782

proceedings before the Enforcement Proceedings courts and the Gibraltar court. *See* Ex. 120

¶¶ 6, 41(ii); Champion Decl. ¶¶ 120–21, 123–24.  Indeed, under Argentine procedural law,

"[w]hen a new event related to the dispute takes place or comes to the knowledge of either party

after the reply to the complaint or the counterclaim has been filed, the parties may inform [the

court] within five days . . . accompanying the documentary evidence and providing all other

evidence they want to use," and Chevron has made several submissions under this provision.

CPCCN Art. 365 (emphasis added); *Pott v. Icicle Seafoods, Inc.*, 945 F. Supp. 2d 1197, 1200

(W.D. Wash. 2013) (noting a lack of evidence that an Argentinian court would be unreceptive to

Section 1782 discovery).  Similarly, Brazilian procedure allows parties to supplement the record

with new evidence, and Chevron has made multiple submissions of new evidence under this

provision. *See* CCP Art. 397; *see also, e.g.*, *In re IPC Do Nordeste, LTDA, for an Order Seeking

Discovery Under 28 U.S.C. § 1782*, No. 12-50624, 2012 WL 4448886, at *6 (E.D. Mich. Sept.

25, 2012) (internal quotations omitted) ("[T]here is . . . no conclusive evidence that a Brazilian

court would be unreceptive to materials discovered here.").  In addition, the applicable

procedural rules in Gibraltar enable parties to obtain evidence for use in foreign proceedings,

with the permission of the Gibraltar court. *See* Gibraltar Act No. 1948-10 (Evidence Act) §§ 9–

11 (addressing applications for assistance in obtaining evidence for use in Gibraltar in foreign

civil proceedings in another court outside of Gibraltar).  Accordingly, there is nothing to suggest

that the foreign tribunals here would not be receptive to any evidence obtained in this

proceeding.

### 3.    Chevron Is Not Attempting to Circumvent Foreign Proof-Gathering Restrictions

The third discretionary *Intel* factor, whether the applicant is attempting to "circumvent foreign proof-gathering restrictions"—is meant to preclude bad faith misuse of the process. An applicant is not required to seek discovery of the materials from the foreign tribunal before filing a Section 1782 application and the information sought need not be discoverable there. *Intel*, 542 U.S. at 253 ("We now hold that § 1782(a) does not impose . . . a [foreign-discoverability] requirement."); *In re Bayer*, 146 F.3d at 196 ("Indeed, a 'quasi-exhaustion requirement' . . . has been rejected by those courts that have addressed it.").

There is no evidence here of any bad faith misuse of process. On the contrary, Chevron is acting in good faith in an effort to obtain evidence to defend itself against a fraudulent $9.5 billion judgment.[8]  Chevron seeks discovery relevant to the Gibraltar and Enforcement Proceedings because the target of the discovery is located in this District, and not as an attempt to circumvent foreign restrictions. *Cf. In re Applic. for an Order for Judicial Assistance in a Foreign Proceeding in the Labor Court of Brazil*, 466 F. Supp. 2d 1020, 1032 (N.D. Ill. 2006) (finding application for discovery under Section 1782 was "not an attempt to circumvent Brazilian proof-gathering restrictions and that this factor supports granting the discovery request."). Accordingly, this factor also weighs in Chevron's favor.

### 4.    The Discovery Is Neither Unduly Burdensome Nor Intrusive

Chevron's discovery requests as set forth in the proposed subpoena, attached as Exhibit

---

[8]  Other district courts that have granted Section 1782 applications filed by Chevron have found that Chevron's attempts to obtain discovery for use in foreign proceedings related to the Lago Agrio litigation were made in "good faith." *E.g.*, *Chevron Corp. v. Stratus Consulting, Inc.*, No. 10-cv-00047-JLK (D. Colo.) (Mar. 4, 2010), Hr'g Tr. at 6:21–23 (finding that Chevron's Section 1782 application was "a good-faith effort to obtain probative evidence"); *Chevron Corp. v. 3TM Consulting, LLC*, No. 4:10-mc-00134 (S.D. Tex. Apr. 5, 2010), at 2 (same).

1, are not unduly burdensome or intrusive. Chevron tailored its requests to seek only those materials relevant to the Enforcement Proceedings and the Gibraltar Proceedings. *See London v. Does 1-4*, 279 F. App'x 513, 515 (9th Cir. 2008) (no undue burden "[g]iven the need for the evidence, and the minimal invasion required" where Section 1782 request tailored narrowly). The proposed subpoena requests documents relating to MCSquared's efforts to support the enforceability of the Ecuadorian judgment and attack Chevron, as well as evidence relevant to the ROE's coordination with the LAPs. These topics are relevant to whether the Ecuadorian judgment is entitled to recognition and enforcement as well as to the allegations of collusion and corruption at issue in the Gibraltar Proceedings. A deposition of MCSquared is also warranted to address what work MCSquared did for the ROE to support enforcement of the Ecuadorian judgment and how it coordinated with the LAPs.

In short, Chevron has tailored its requests to seek only those materials relevant to the Enforcement Proceedings and the Gibraltar Proceedings, and discovery should accordingly be permitted. *See London*, 279 F. App'x at 515. And any small burden on MCSquared is outweighed by its participation in a collusive and fraudulent scheme and by the need to unravel the corruption associated with the Lago Agrio litigation.

## C.    The Information Sought Is Relevant and Therefore Presumptively Discoverable Under Section 1782

Although relevancy is not a requirement under Section 1782, *see In re Applic. of Chevron Corporation*, 709 F. Supp. 283, 305 (S.D.N.Y. 2010) (noting required showing is "likely relevance"), where the information sought is relevant, as it is here, it is "presumptively discoverable" under Section 1782. *In re Bayer AG*, 146 F.3d 188, 196 (3d Cir. 1998) ("[R]elevant evidence is presumptively discoverable under § 1782."). Since 2009, Chevron, the LAPs, and the ROE all have sought Section 1782 discovery from multiple sources in aid of

26

ongoing Ecuadorian litigation, as well as a related international arbitration between Chevron and the ROE. *See, e.g.*, *In re Applic. of Chevron Corp.*, 736 F. Supp. 2d 773 (S.D.N.Y. 2010); *In re Applic. of Chevron Corp.*, 749 F. Supp. 2d 141 (S.D.N.Y. 2010). All of these applications have been granted. Ex. 121. These actions have revealed evidence that is highly relevant to the proceedings for which the evidence has been sought, including the *Crude* outtakes,[9] which provided video evidence of the LAPs' collusion with Cabrera, and communications demonstrating the LAPs' knowledge that the ghostwriting of the Cabrera report was unlawful, and that they would all "go to jail" if it emerged. Ex. 37.

### 1.   The Information Is Relevant to Whether the ROE Has Promoted Enforcement of the Judgment

Chevron seeks discovery from MCSquared related to the ROE's efforts to promote enforcement of the Ecuadorian judgment. *See* Ex. 1 at requests 1, 3–4, 6–7, 10–13, 18–19, 23–25. This discovery is directly relevant to the Enforcement Proceedings. Despite Correa's insistence that "the Ecuadorian state could not get in—involved in a legal action that is, uh, private in nature" (Ex. 81 at 12 of 19), the ROE has made clear its support for the LAPs against a backdrop of the executive branch interfering with Ecuadorian courts in cases of interest to the state. RICO Decision at 610–15; Ex. 144. MCSquared has explicitly linked enforcement of the Ecuadorian judgment with the ROE's interests, hiring subcontractors to help it "inform the US public of Chevron's responsibilities so the public interest of Ecuador will be furthered." Ex. 137 at 4. The protests MCSquared organized were explicitly directed at condemning Chevron for

---

[9] As one federal court noted, the release of the outtakes "sent shockwaves through the nation's legal communities, primarily because the footage shows, with unflattering frankness, inappropriate, unethical and perhaps illegal conduct." *In re Chevron Corp.*, No. 1:10-mc-00021-22, Dkt. 77, slip op. at 3–4 (D.N.M. Sept. 2, 2010) (attached as Ex. 122). Another federal court stated that "[w]hat has blatantly occurred in this matter would in fact be considered fraud by any court." *Chevron Corp. v. Champ*, Nos. 1:10-mc-27, 1:10-mc-28, 2010 WL 3418394, at *6 (W.D.N.C. Aug. 30, 2010).

"refus[ing] to comply with the Ecuadorian court's ruling to complete the environmental remediation." Exs. 73, 79. MCSquared also coordinated with the LAPs and reinforced their messages, including by funding activities such as the "shareholders' protest" in the name of the LAPs while concealing the ROE's monetary and material support and propagating a social media campaign seeking to pressure Chevron to pay the Ecuadorian judgment. Discovery from MCSquared would expose MCSquared's orchestration of this social media campaign and possible coordination with the LAPs themselves. MCSquared thus has evidence directly relevant to the ROE's collusion with the LAPs to enforce the fraudulent judgment.

### 2. The Information Is Relevant to Whether the ROE Has Provided Financial Support to the Lago Agrio Plaintiffs

Chevron seeks discovery from MCSquared related to the ROE's financial support of the LAPs. *See* Ex. 1 at requests 1–5, 11, 13, 18–25. This discovery is relevant to both the Enforcement Proceedings and the Gibraltar Proceedings. In the Gibraltar Proceedings, for example, DeLeon has denied Chevron's allegations that the ROE is acting in concert with the LAPs and that President Correa is their ardent supporter. *See* Ex. 120 ¶ 19. Chevron seeks evidence to prove otherwise.

In the Enforcement Proceedings, the LAPs have denied receiving financial support from the ROE. Indeed, in both Brazil and Argentina, the LAPs sought to proceed *in forma pauperis*, claiming that they did not have the resources to bear the cost of the proceedings. *See* Champion Decl. ¶ 121–122. Chevron opposed these petitions because the LAPs have funders and supporters, and are not entitled to *in forma pauperis* status. *Id.*

Discovery from MCSquared is relevant to these proceedings because, on information and belief, MCSquared has evidence that the ROE has provided the LAPs with direct support. The coordination between social media campaigns linked to MCSquared (*e.g.*, Toxic Effect,

Chevroff), and allies of the LAPs, including Amazon Watch and the LAPs' attorneys, demonstrates organized cooperation between the LAPs and the ROE. Postings on the social media accounts of MCSquared's principals—deleted shortly after their involvement with the ROE came to light (Exs. 125–130)—suggest that they have been in direct contact with the LAPs' representatives (*see* Ex. 127), as does the fact that the LAPs and their representatives have attended MCSquared-organized events (Exs. 80, 85). And, finally, the $6.4 million that the ROE paid MCSquared for one year of work was "a lot of money to put out some press releases and design a website," and discovery may reveal whether these funds were used to provide other support to the LAPs. Ex. 60.

Based on these facts, it is likely that MCSquared has evidence that the ROE has offered the LAPs support in connection with the pressure campaign against Chevron, and it may even have evidence that the ROE has offered the LAPs direct financial assistance. Further, MCSquared may also have evidence regarding the efforts of the LAPs' funders—such as DeLeon, Torvia, and Woodsford—and others such as the Gibraltar clearing-house Amazonia to back this extortionate scheme. This evidence would be directly relevant to the Enforcement Proceedings and the Gibraltar Proceedings.

### 3. The Information Is Relevant to Whether the ROE Is Tampering with Witnesses

Chevron seeks discovery related to the ROE's interference with witnesses who have testified—or who will testify—on Chevron's behalf. Ex. 1 at requests 1, 3, 6–15, 18–19, and 22–26. MCSquared is likely to have materials responsive to these requests, which are relevant to each of the Enforcement Proceedings and the Gibraltar Proceedings. For example, the Nation's Traitors website, which circumstantial evidence indicates was created by MCSquared, appears intended to intimidate Ecuadorians who have provided testimony for Chevron. Among those is

Vladimiro Álvarez Grau, whom this Court found "testified credibly" at the RICO trial regarding the lack of impartiality of Ecuador's courts. RICO Decision at 609–10. To the extent MCSquared has evidence related to the ROE's efforts to intimidate Álvarez, or witnesses like Álvarez, it is relevant to the Enforcement Proceedings and the Gibraltar Proceedings, because Álvarez and others featured on the Nation's Traitors' website may testify in those proceedings. Chevron expects discovery in this action to demonstrate whether MCSquared and the ROE did indeed create this and other websites.

## IV.   CONCLUSION

For the foregoing reasons, Chevron requests that the Court grant its application for discovery and issue the requested subpoenas for document and deposition discovery from MCSquared.

Dated:   New York, New York
         November 24, 2014

Respectfully submitted,

By: _Randy M. Mastro_
GIBSON, DUNN & CRUTCHER LLP

Randy M. Mastro
Andrea E. Neuman
Anne Champion
200 Park Avenue
New York, NY  10166-0193
Telephone:     212.351.4000
Facsimile:     212.351.4035

*Attorneys for Petitioner Chevron Corporation*