IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Magistrate Judge Kathleen M. Tafoya**

Civil Action No. 14–cv–01354–RBJ–KMT

CHEVRON CORPORATION,

      Petitioner,

v.

ANDRES SNAIDER,

      Respondent.

---

# ORDER

---

      This matter is before the court on Respondent Andres Snaider's ("Snaider") "Motion to Modify *Ex Parte* Order and Partially Quash Subpoena under 28 U.S.C. § 1782, or in the Alternative, for a Protective Order under Fed. R. Civ. P. 26(c)." [Doc. No. 21, filed Aug. 29, 2014.] Petitioner Chevron Corporation's ("Chevron") Response was filed on September 19, 2014 [Doc. No. 24] ("Resp.") and Snaider's Reply was filed on October 10, 2014 [Doc. No. 28] ("Reply). On October 27, 2014 the court heard oral argument on the motions.

      On November 13, 2014, Snaider filed a "Notice of Supplemental Authority" [Doc. No. 30], attaching a "Judgment" dated November 10, 2014, by the Honourable Justice Adroam Jack from the Supreme Court of Gibraltar in Case Nos. 2012-C-232, 2012-C-112, 2014-C-113, and 2014-C-111 ("Gibralter Order") [Doc. No. 30-1]. Chevron filed its "Response to Notice of

Supplemental Authority" [Doc. No. 31] on November 18, 2014.  The matter is ripe for review and ruling.

## PROCEDURAL BACKGROUND IN THIS CASE

As part of what has become a multi-national dispute between Petitioner Chevron and a group of indigenous Ecuadorians concerning alleged environmental damage, Chevron seeks discovery documents from Andres Snaider, a Colorado resident.  This case was initiated upon the filing of Chevron's *ex parte* "Petition and Application for an Order under 28 U.S.C. § 1782 Permitting Chevron Corporation to Issue Subpoenas for the Taking of Depositions and the Production of Documents from Andres Snaider" [Doc. No. 1], filed May 14, 2014 and Memorandum in Support [Doc. No. 2] ("Petition" or "Pet.").[1]  In its Petition, Chevron sought authorization to subpoena discovery from Snaider in aid of its case before the Supreme Court of Gibraltar against James Russell DeLeon ("DeLeon") and an investment company he controls, Torvia Limited (the "Gibraltar Action"), as well as in aid of its defense against enforcement proceedings brought against Chevron in multiple foreign jurisdictions, including Argentina and Brazil, seeking to collect on an Ecuadorian judgment originally rendered in favor of the original plaintiffs, the indigenous Ecuadorians, or on the appellate order therefrom (the "Enforcement Actions").  District Judge R. Brooke Jackson entered a summary order granting the Petition on May 20, 2014.  [Doc. No. 11.]

---

[1] The Memorandum, not the three-page Petition, includes the legal argument and support for the discovery requested by Chevron.   References in this Order to Petition or Pet. are directed to the Memorandum, Doc. No. 2.

2

Snaider now seeks to modify or partially quash the subpoena issued by Chevron, and/or obtain a protective order under Fed. R. Civ. P. 26(c).  The final version of the Subpoena is attached as Exhibit A to Chevron's Response.  [Doc. No. 24-1.] [2]

## FACTUAL BACKGROUND

### A.    *Ecuadorian and New York RICO cases*

The complex background of this dispute began with a lawsuit filed in Ecuador against Chevron (the "Lago Agrio Action") by 47 named plaintiffs (the "Lago Agrio Plaintiffs" or "LAPs"), through their attorney Steven Donziger, a New York lawyer, on behalf of a "class" of thousands of Ecuadorian indigenous peoples.  Plaintiffs in that suit claimed that Chevron was responsible for extensive environmental damage caused by the oil activities of Texaco, Inc., undertaken more than twenty years prior and long before Chevron acquired Texaco's stock.  The LAPs ultimately obtained a multi-billion dollar judgment (the "Ecuadorian Judgment") against Chevron in the Lago Agrio Action and have now begun seeking to enforce it around the world through the Enforcement Actions, with more such actions in the offing.

On February 1, 2011, just before the Ecuadorian court issued its original judgment, Chevron brought suit against Donziger and others in the Southern District of New York, alleging that any judgment rendered in the Lago Agrio Action against Chevron was obtained as part of a RICO conspiracy that included fraudulent and criminal conduct by the LAPs and their attorneys (the "NY RICO Action").  On March 4, 2014, United States District Judge Lewis A. Kaplan in the Southern District of New York found, in a 320-page opinion, that Donziger and others had

---

[2] All references to Chevron's Subpoena for Production of Documents pursuant to the Order of District Judge Jackson are taken from the August 29, 2014 subpoena (the final subpoena), Attachment A.

"corrupted the Lago Agrio case" by submitting "fraudulent evidence" and engaged in other

wrongdoing including:

> They coerced one judge, first to use a court-appointed, supposedly impartial, "global expert" to make an overall damages assessment and, then, to appoint to that important role a man whom Donziger hand-picked and paid to "totally play ball" with the LAPs. They then paid a Colorado consulting firm secretly to write all or most of the global expert's report, falsely presented the report as the work of the court-appointed and supposedly impartial expert, and told half-truths or worse to U.S. courts in attempts to prevent exposure of that and other wrongdoing. Ultimately, the LAP team wrote the Lago Agrio court's Judgment themselves and promised $500,000 to the Ecuadorian judge to rule in their favor and sign their judgment. If ever there were a case warranting equitable relief with respect to a judgment procured by fraud, this is it.

*Chevron Corp. v. Donziger,* 974 F. Supp. 362, 384 (S.D.N.Y. 2014).

**B.    *The Gibraltar Action***

In December 2012, Chevron filed the Gibraltar Action alleging that Russell DeLeon and

his company, Torvia Limited, major funders of the Lago Agrio Action, knew or were recklessly

indifferent to the commission of the fraud in both Ecuador and the United States that corrupted

the Lago Agrio Action.  (*See* Petition at 17-18.)  Chevron alleges that DeLeon and Torvia

Limited provided millions of dollars to support the Lago Agrio Action and participated in the

underlying conspiracy that Judge Kaplan found to be corrupt and in violation of the federal

RICO statute.  Prior to the filing of the Petition in this case, the Gibraltar court denied DeLeon

and Torvia's motion to dismiss the Gibraltar Action.  (*See id.*)  On November 10, 2014, while

ruling on the instant motion was under advisement, the Gibraltar court entered the Gibraltar

Order which, in part, precluded Chevron from obtaining discovery from a company Chevron

claimed was a fiduciary holding stock shares of Gibraltar defendant Torvia and non-defendant

Amazonia.  The court held, "[a]ll of the documentation sought against the [fiduciary] can be the

subject of a witness summons under CPR Rule 34.2(1)(b). . . . . Accordingly, on this ground I consider that I have no jurisdiction to make the order sought." (Gibraltar Order ¶ 31.) However, in the same Order, the Gibraltar court granted non-party discovery subpoenas against TC Payment Services on the grounds that the company likely had information relevant to the funding of the alleged conspiracy at issue in the case. (*Id.* ¶¶ 48–65.) Implicit in the Gibraltar Order is that TC Payment Services would not be subject to a witness summons and therefore seeking non-party subpoenaed information and documents was appropriate.

## C.    *The Enforcement Actions*

The Enforcement Actions have been filed by law firm now representing the LAPs, Patton Boggs. Chevron claims these actions are part of a "multi-jurisdictional strategy" to enforce the over $9 billion Ecuadorian Judgment notwithstanding the result of the NY RICO Action and the findings by Judge Kaplan that the judgment was illegally obtained and is therefore unenforceable.[3] (Petition at 19.) More specifically, the LAPs filed actions in both the Supreme Court of Justice in Brasilia, Brazil, and Argentina's National Civil Trial Court 61 against

---

[3] Judge Kaplan, in the NY RICO action found that "Patton Boggs prepared a document setting forth the LAPs'[enforcement] plan, a document that was entitled 'Invictus' and that has become known as the 'Invictus Memo.' *Chevron v. Donziger*, 974 F. Supp 2d 362, 476-77 (S.D.N.Y. 2014). The court further stated, "It set out a plan to enforce it 'quickly, if not immediately, on multiple enforcement fronts—in the United States and abroad.' It noted that '[o]btaining recognition of an Ecuadorian judgment in the United States is undoubtedly the most desirable outcome.' But Invictus recognized also that enforcement in the United States could prove difficult. It emphasized that 'Patton Boggs' current and former representation of numerous, geographically diverse foreign governments means that barriers to judgment recognition in a given country may not necessarily preclude enforcement there.' It further elaborated that 'Patton Boggs [would] use its political connections and strategic alliances to ascertain which nations' governments are not beholden to Chevron, so as to minimize the prospect of adverse governmental interference in the enforcement process.'" *Id.* Judge Kaplan stated, "The Invictus Memo made clear that the LAPs' enforcement strategy contemplated an initial multi-pronged attack on Chevron, its assets, and subsidiaries in multiple jurisdictions outside the United States . . . ." *Id.*

Chevron for recognition of the Ecuadorian Judgment in spite of the findings in the NY RICO Action, both of which are currently ongoing. (*Id.*) There is evidently also an enforcement proceeding ongoing in Canada. (Mot. at 11-12, Ex. B-1 ¶ 52.)

In addition, Chevron claims the LAPs "maintain a list of approximately 30 potential countries that recognize foreign judgments and where Chevron has assets" and have allegedly vowed to file enforcement actions in these countries "as necessary to ensure that the full amount of the [Ecuadorian Judgment] can be satisfied." (*Id.* at 19.) Chevron alleges that obtaining the fraudulent judgment and filing it in various foreign venues is all part and parcel of a conspiracy to defraud Chevron out of billions of dollars.

**D.   *Andres Snaider***

      **1.   *Obtaining Funding and Participation in the Lago Agrio Action***

According to the Declaration of Andres Snaider attached to the Motion as Exhibit C [Doc. No. 21-6], Snaider is an Ecuadorian national residing in Colorado and a founder and manager of Nextant, LLC, ("Nextant") a business consulting firm. (*Id.* ¶¶ 3, 7.) Snaider, Donziger , and DeLeon were all classmates at Harvard Law School in the late 1980s. *(Id.* ¶ 5.) Snaider and Donziger initially approached DeLeon, a wealthy investor with an interest in film, about investing in a documentary detailing the environmental damage at issue in the Lago Agrio Action. (*Id.* ¶¶ 10-12.) Chevron alleges that subsequent to this initial contact, DeLeon eventually invested $3.25 million in the Lago Agrio Action. Chevron alleges that Snaider was involved in structuring certain DeLeon investments in the Lago Agrio Action and that Snaider reviewed "final discussion drafts of the [Torvia] funding agreement" in May 2011. (Pet. at 16.) Altogether, Chevron asserts that Snaider was "instrumental" in procuring significant funding for

the Lago Agrio Action, including the behavior which was held to be fraudulent and in violation of the RICO statute in the New York court.  (*Id.* at 14.)

### 2.    *NY RICO Action Discovery Rulings Re: Snaider*

In the NY RICO action, Chevron moved to compel documents about non-party Snaider's involvement in the Lago Agrio Action, which Chevron claimed were in the control of the defendants, including Donziger and the LAPs, but in the possession of their Ecuadorian co-counsel in the Lago Agrio Action.  (*Id.* at 16.)  The LAPs responded by bringing an action in Ecuador attempting to obtain a ruling that Ecuadorian law prevented the RICO Action defendants (specifically Donziger and the LAPs) from providing documents for discovery purposes in the RICO Action.  (*Id.* (citing Ex. 124 at 84-87 & Ex. 125.)  Donziger was, at that time, both the LAPs' United States counsel and also a defendant in the NY RICO case.  To combat Chevron's attempt to gain discovery regarding Snaider, Donziger "temporarily" vacated his position as the LAPs' United States representative and appointed Snaider to assume that role on his behalf.  (*Id.* at 16-17 (citing Ex. 126.)

Chevron also attempted to obtain discovery about Snaider's activities with a subpoena directed at the law firm of Patton Boggs, which had joined as plaintiffs' counsel in the Lago Agrio Action in 2010.  That subpoena sought "[a]ll documents related to Andres Snaider" and "[a]ll documents related to Nextant."  (Mot at 7, citing Ex. F at 64-71.)  Patton Boggs objected on several grounds, including that the requests impermissibly sought information regarding the LAPs' post-judgment enforcement strategy.  (*Id.* at 7-8.)  Judge Kaplan sustained Patton Boggs' objections with little discussion.  (*Id.* at 8, citing Ex. G ¶ 1 and Ex. H at 34-36.)

Several months later, Chevron served the same requests upon Donziger.  (*Id.* (citing Ex. I at 49-50).)  Judge Kaplan found that the discovery requests were "broad as all outdoors" (*id.,* quoting Ex. A at 17:15) and also ruled that any post-judgment documents, while likely relevant, would relate to enforcement of the Ecuadorian Judgment and therefore would likely be protected from production by the work product doctrine.  (*Id.,* citing Ex. A at 18:1-5.)

Finally, Chevron subpoenaed Snaider directly to produce documents as a non-party and to sit for a deposition, claiming Snaider had "assume[d] the role of coordinating the legal strategy of the [Lago Agrio Action] in the United States" and claiming Snaider had played an "important role in Defendants' scheme."  (*Id.* at 8, citing Ex. K at 2.)  Judge Kaplan denied this last effort as untimely.

As noted *infra*, Judge Kaplan ultimately found that the NY RICO defendants had engaged in fraud and extortion in the Lago Agrio Action and that the judgment obtained in that action was unenforceable.  *Chevron,* 974 F. Supp. 2d 362.  Judge Kaplan, however, does not discuss the roles, if any, played by Snaider and/or Nextant in the RICO scheme.  (Mot. at 11 (citing *Chevron,* 974 F. Supp. 362).)  Given that Chevron was blocked in its discovery efforts with respect to Snaider and Nextant in that case, however, the court does not find that this absence suggests Snaider and Nextant were <u>not</u> involved in fraudulent conduct and/or in the conspiracy currently alleged in the Gibraltar Action.

### 3. *Enforcement Efforts*

Chervron asserts that Snaider and Nextant escalated their involvement in the conspiracy to defraud Chevron when the LAPs began their efforts to enforce the Ecuadorian Judgment, in spite of Judge Kaplan's findings and opinion in the NY RICO Action.  More specifically, Chevron

alleges that in 2011, Snaider and Nextant manager, Juan Pablo Navas, were involved in the creation of Amazonia, an entity created as a vehicle to manage the proceeds to be received from collection efforts to enforce the Ecuadorian Judgment.  (*Id.* at 15.)  Based on documents produced during the NY RICO case, Chevron asserts that Snaider and Nextant were paid approximately $1.3 million dollars for their efforts in obtaining funding to successfully pursue and obtain the Ecuadorian Judgment and for their post judgment activities associated with collection of proceeds, if any, from execution in foreign jurisdictions.  (*Id.*)

## LEGAL STANDARD

### A.   *Use in a Foreign Proceeding*

A petitioner seeking discovery for proceedings in a foreign jurisdiction must meet the following four requirements for an application under Section 1782 to be granted:

> (1) the request must be made "by a foreign or international tribunal," or by "any interested person"; (2) the request must seek evidence, whether it be the "testimony or statement" of a person or the production of "a document or other thing"; (3) the evidence must be "for use in a proceeding in a foreign or international tribunal"; and (4) the person from whom discovery is sought must reside or be found in the district of the district court ruling on the application for assistance.

*In re Application of Michael Wilson & Partners, Ltd.,* Case No. 06-cv-02575-MSK-PAC, 2007 WL 22221438, at *2 (D. Colo. July 27, 2007) (quoting *In re Clerici*, 481 F.3d 1324, 1331–32 (11th Cir.2007)).  The parties' sole dispute is whether the third factor is satisfied—specifically, and as discussed below, Snaider disputes that the subpoena seeks documents "for use" in a foreign proceeding, claiming that the documents sought are not relevant to either the Gibraltar Action or the Enforcement Actions.

**B.      Intel Factors**

Even if the court finds the *Michael Wilson & Partners* factors are fully satisfied, the court must then consider whether certain discretionary facts weigh in favor of granting the application and the requested discovery.  These factors include:  (1) whether the party from whom discovery is sought is a participant in a foreign proceeding, or already subject to the jurisdiction of the foreign tribunal; (2) the nature and character of the foreign proceedings; (3) the receptivity of the foreign tribunal to such judicial assistance; (4) whether the request is an attempt to circumvent foreign discovery restrictions; and (5) whether the requests are unduly intrusive or burdensome. *See Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 264-265 (2004).

**C.      Federal Rules of Civil Procedure**

Assuming a finding that the discovery is for use in a foreign litigation and a favorable determination considering the *Intel* factors, any discovery nonetheless remains subject to the Federal Rules of Civil Procedure.  *See Texas Keystone, Inc. v. Prime Natural Res., Inc.*, 694 F.3d 548, 554 (5th Cir. 2012) ("[Section] 1782 does not establish a standard for discovery.  Instead it provides for a threshold determination of whether to allow foreign litigants to enjoy discovery in U.S. courts in accordance with the federal rules.") (quotation omitted).  A motion to quash, therefore, also is governed by Rule 45(d)(3), which directs a court to quash a subpoena that "subjects a person to undue burden."  Fed. R. Civ. P. 45(d)(3)(iii) & (iv); *see, e.g., General Steel Domestic Sales, LLC v. Chumley*, No. 13-cv-769-MSK-KMT, 2014 WL 3057496, at *1 (D. Colo. July 7, 2014) (motion to quash non-party discovery granted when information sought was "overbroad, irrelevant, unnecessary, and was a fishing expedition designed to gain information

. . . not for purposes of [the] litigation").   Federal Rule of Civil Procedure 26(b)(2)(C) provides

that a court "must limit the frequency or extent of discovery otherwise allowed....if it determines

that":

> (i) the discovery sought is unreasonably cumulative or duplicative, or can be
> obtained from some other source that is more convenient, less burdensome, or less
> expensive;
>
> (ii) the party seeking discovery has had ample opportunity to obtain the
> information by discovery in the action; or
>
> (iii) the burden or expense of the proposed discovery outweighs its likely benefit,
> considering the needs of the case, the amount in controversy, the parties"
> resources, the importance of the issues at stake in the action, and the importance
> of the discovery in resolving the issues.

In addition, Federal Rule of Civil Procedure 26(c) provides that a court may "for good cause,

issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue

burden or expense."

## ANALYSIS

As a preliminary matter, the court addresses Chevron's assertion in its Petition that

should Snaider, an attorney, assert the attorney-client or other privilege as to documents that are

otherwise responsive, any such privilege has been rendered inapplicable by virtue of the

crime/fraud exception.  (Pet. at 22-27.)

This court is unclear about whether Snaider actually acted as an attorney at all in any of

the litigation against Chevron.  Snaider claims to have been hired by DeLeon at one point;

however he has not appeared on DeLeon or Torvia Limited's behalf in the Gibraltar case or in

any other case of which the court has been made aware.  Further it does not appear that Snaider

entered his appearance on behalf of the LAPs in any case, notwithstanding his appointment as

the LAPs "U.S. Representative" in the NY RICO case when Chevron was attempting to get discovery related to Snaider from Donziger and the LAPs.

The crime/fraud exception to attorney client or work product privilege only applies when what is sought from an attorney is professional legal service and it is not part of the lawyer's profession to conspire with the client to commit a crime or fraud. *See United States v. Johnston*, 146 F.3d 785, 795 (10th Cir. 1998). That is to say, where a client consults an attorney for some illegal purpose from the beginning of the relationship, there is no need for an exception to normal privilege rules because the communications between lawyer and client strictly undertaken for an illegal purpose were never privileged in the first place. *See* John H. Wigmore, Code of Evidence, 3d ed., §§ 2416–2418 (1942). If, on the other hand, the attorney-client relationship is immaculate at its conception, but then devolves into attorney assistance in illegal activity, then all of the communications between the client and the attorney are potentially privileged except those that are germane to some criminal or fraudulent goal. *See White v. American Airlines*, 915 F.2d 1414, 1423 (10th Cir. 1990) (exception applied without any evidence that attorney was authorized to urge corporate employees to perjure themselves).

For the crime-fraud exception to apply, the moving party "must present *prima facie* evidence that the attorney participation in the crime or fraud has some foundation in fact," *In re Grand Jury Subpoenas,* 144 F.3d 653, 660 (10th Cir. 1998), and must also show that "the purpose of the communication was to further crime or an intended fraud," *In re Grand Jury Proceedings,* 857 F.2d 710, 713 (10th Cir. 1988).

Whether Chevron is proven correct that some otherwise privileged documents in the custody of Snaider should be stripped of privilege protections in light of the crime-fraud

exception is irrelevant to the considerations at this stage of the proceedings, however.  Before that question can be addressed at all, this court must decide whether or not Chevron's discovery requests are allowable under Section 1782 and, if so, whether *Intel* and the Federal Rules would nonetheless preclude or limit Snaider's compliance with Chevron's subpoena.  Should Chevron successfully overcome Snaider's motion to quash, Snaider would first be obligated to respond to the discovery requests, including objections he might make on the basis of privilege.  Should Snaider wish to assert that certain documents are privileged, he would be required to list on a legally sufficient privilege log all documents he claims are subject to a delineated privilege. Only then would the possible application of the crime/fraud exception to otherwise privileged documents be considered.

The application – or non-application – of the crime/fraud exception does not lessen or enhance the burden, if any, upon non-party Snaider with respect to responding to discovery at this stage.  A review for privilege, should Snaider and his counsel believe such to be tenable, would need to be made in any event and a privilege log both created and produced.  Therefore, especially as to issues of burden, application of the crime/fraud exception to privilege is a non-issue at this stage.

**A.     Subpoena Request Nos. 1-2 and 4-5 – Documents relating directly to the activities of the Gibraltar Defendants**

1. All COMMUNICATIONS with RUSSELL DELEON or any representative of RUSSELL DELEON related to the CHEVRON LITIGATIONS,[4] including, but not limited to:

---

[4] In the subpoena, Chevron defines CHEVRON LITIGATIONS as " means and refers to any one or all of the LAGO AGRIO LITIGATION, the AGUINDA LITIGATION, the ROE LITIGATION, the AAA LITIGATION, the BIT ARBITRATION, the 1782 ACTIONS, the CRIMINAL CASES, the RICO ACTION, and the GIBRALTAR PROCEEDING (both before and after the filing of each litigation)."  (Resp. at ¶ 12.)

a. All COMMUNICATIONS related to any funding of or investment in the CHEVRON LITIGATIONS by RUSSELL DELEON, whether direct or indirect;
b. All COMMUNICATIONS related to any interest held by RUSSELL DELEON in the LAGO AGRIO JUDGMENT, whether direct or indirect.

2. All DOCUMENTS related to TORVIA or any representative of TORVIA related to the CHEVRON LITIGATIONS, including, but not limited to:
a. All COMMUNICATIONS related to any funding of or investment in the CHEVRON LITIGATIONS by TORVIA, whether direct or indirect;
b. All COMMUNICATIONS related to any interest held by TORVIA in the LAGO AGRIO JUDGMENT, whether direct or indirect;
c. All DOCUMENTS related to the management and operations of TORVIA to the extent such management or operations relate in any way to the CHEVRON LITIGATIONS;
d. All DOCUMENTS related to GT NOMINEES LIMITED, the sole listed shareholder of TORVIA;
 e. All DOCUMENTS related to the true beneficial owners of the shares of TORVIA.

4. All COMMUNICATIONS with RUTH PARASOL or any representative of RUTH PARASOL related to the CHEVRON LITIGATIONS, including, but not limited to:
a. All DOCUMENTS related to RUTH PARASOL's ownership of TC PAYMENT SERVICES and all payments made by or through TC PAYMENT SERVICES related to the CHEVRON LITIGATIONS.

5. All COMMUNICATIONS with JULIAN JARVIS related to the CHEVRON LITIGATIONS, including, but not limited to:

Snaider implicitly admits that Chevron's requests for communications and documents relating to DeLeon, Torvia Limited, DeLeon's wife (Parasol), and Torvia's lawyer (Jarvis) are relevant to the Gibraltar Action and for use in the Gibraltar Action.  (Mot. at 31.)  Similarly, Snaider does not argue that application of the *Intel* factors to these questions would result in a finding of non-discoverability.  (*Id.*)  Snaider's objection to producing discovery of this category of documents is based primarily on the Federal Rules of Civil Procedure.  Snaider argues that these documents may be obtained from the parties in the action, and therefore requesting the documents from non-party Snaider is unjustified—particularly where Chevron has not attempted to first obtain these documents from the Gibraltar defendants.   As support, Snaider cites to *In re*

*Pinchuk*, Case No. 14-CIV-20047, 2014 WL 1328484, at * 5 (S. D. Fl. Mar. 31, 2014), for the following proposition: "[W]hile there is no 'exhaustion' *requirement* for seeking discovery under § 1782, the District Court may, in its discretion, properly consider a party's failure to first attempt discovery measures in the foreign jurisdiction." (Mot. at 28-29) (emphasis added.) Interestingly, the *Pinchuk* court was addressing a situation where the litigants were "not arguing that Section 1782 mandates, in every instance and as a threshold matter, that an applicant must have first sought discovery from the foreign tribunal." *In re Pinchuk,* 2014 WL 1328484, at *5. In fact, it is contrary to legal precedent to argue that discovery may not be had from a non-party on the sole basis that the discovery has not been sought from a party in the foreign litigation.

As noted *infra*, the Gibraltar court has recently approved discovery requests made by Chevron to a non-party, TC Payments Services, on the grounds that the company likely had information relevant to the funding of the alleged conspiracy at issue in the Gibraltar case. (Gibraltar Order at ¶ 48-65.) TC Payment Services was, at the relevant time, a wholly owned subsidiary of Timbercove Ltd., which in turn was the family office of Gibraltar Defendant DeLeon and his then-wife, Ms. Parasol. (*Id.* ¶ 52.) TC Payment Services was used by DeLeon and his wife to make payments on their behalf. (*Id.*) Certainly, documents maintained by TC Payment Services could have been discovered through Defendant DeLeon in the main case discovery process. Nonetheless, the Gibraltar court allowed Chevron to obtain discovery directly from TC Payment Services even in light of the fact that the disclosures made by TC Payment Services might well reveal "knowledge of the allegedly illicit purposes of such payments" by TC Payment Services and provide evidence which ultimately could lead to proceedings being

brought against TC Payment Services.  (*Id.* at ¶ 63.)   The same analysis is applicable to Snaider

and his direct dealings with the Gibraltar defendants.

Therefore, the Motion to Quash as to Requests numbered 1, 2, 4 and 5 will be denied.

**B.      Subpoena Request Nos. 18-21 and 24-26 . – Involvement of Snaider and his company in procuring funding for the Lago Agrio Action, defense of the NY RICO Action and the Enforcement Actions.**

18. All DOCUMENTS related to any solicitation of funding for or investments in the CHEVRON LITIGATIONS

19. All DOCUMENTS related to any decision to fund, to continue to fund, or to terminate funding of or investment in any aspect the CHEVRON LITIGATIONS.

20. All DOCUMENTS related to the allocation or distribution of, division of, interest in, or responsibility for any proceeds, revenue, award, penalty, cost, or expense related to the LAGO AGRIO LITIGATION, including DOCUMENTS related to any person who has an interest in or shares in any distribution of any proceeds related to the LAGO AGRIO JUDGMENT [ a/k/a the Ecuadorian Judgment].

21. All DOCUMENTS related to the funding of actions seeking to enforce the LAGO AGRIO JUDGMENT *and all documents related to [FUNDING OF THE] post-judgment proceedings in the LAGO AGRIO LITIGATION.*[5]

24. All DOCUMENTS that both (1) reflect statements made by or to YOU, Steven Donziger, or Russell Deleon, for the purpose, in whole or in part, of soliciting investments or donations for the LAGO AGRIO LITIGATION or efforts to enforce the LAGO AGRIO JUDGMENT, and (2) refer or relate to Dr. Charles Calmbacher.

25. All DOCUMENTS that both (1) reflect statements made by or to YOU, Steven Donziger, or Russell Deleon, for the purpose, in whole or in part, of soliciting investments or donations for the LAGO AGRIO LITIGATION or efforts to enforce the LAGO AGRIO JUDGMENT, and (2) refer or relate to CABRERA or the CABRERA REPORTS.

---

[5] The court considers part two of this request as denoted by italics in this Order to be seeking documents related to the **funding** of post-judgment proceedings in the Lago Agrio Action given its inclusion within the same paragraph as the first phrase.  Otherwise part two of the request is impermissibly linked to another non-similar request and further, as written without the modifier, is also impermissibly overbroad.  Further, Chevron stated at the hearing before this court, "[n]umber 21 specifically requests documents relating to the funding of actions seeking to enforce."  (Trans. at 73.)

26. All DOCUMENTS that both (1) reflect statements made by or to YOU, Steven Donziger, or Russell Deleon, for the purpose, in whole or in part, of soliciting investments or donations for the LAGO AGRIO LITIGATION or efforts to enforce the LAGO AGRIO JUDGMENT, and (2) refer or relate to the POST-CABRERA CLEANSING CONSULTANTS or the CLEANSING EXPERT REPORTS, including, but not limited to, the writing, drafting, creation, editing, or revision of any DOCUMENT filed with the LAGO AGRIO COURT under the signature of, in the name of, or purported to be authored by any of the POSTCABRERA CLEANSING CONSULTANTS.

Clearly the knowledge and information held by and understood by DeLeon and Torvia Limited, as financial backers of litigation against Chevron, about the actions taking place in and around the Lago Agrio litigation—which have been held fraudulent and corrupt by Judge Kaplan in the New York RICO case—is highly relevant to whether or not there was an illegal conspiracy acting against Chevron and whether the Gibraltar defendants were members of such a conspiracy.  Important to the analysis is recognition that the conspiracy alleged by Chevron in all the foreign venues is not a conspiracy to obtain a fraudulent judgment.  The alleged conspiracy is to illegally obtain money from Chevron.  As such, obtaining the Judgment is simply an overt act of the alleged conspiracy.  The alleged goal of the conspiracy is not attained until and unless the Ecuadorian Judgment, or its later appellate judgment, is executed upon.

The Gibraltar court has found

Chevron have established a reasonably arguable case against Mr DeLeon and Torvia.  It follows that Chevron are likely to have (at any rate as a matter of law) an arguable case against other people involved in the funding of the Lago Agrio litigation.  This of course is subject to issues about what knowledge an alleged conspirator might have.  However, Chevron can legitimately say that someone putting substantial sums forward to fund litigation should be presumed to have some knowledge of at least some of the facts surrounding the Lago Agrio litigation.

(Gibraltar Order at ¶ 15) (punctuation and verb disagreement as in original).  This court agrees with the Gibraltar court that information about funding for both the Lago Agrio Action and the

the post judgment proceedings in Ecuador is relevant to both whether there is an enforceable judgment – a salient issue in the Enforcement Actions – and whether DeLeon, a significant financier of the alleged conspiracy, had knowledge about the illegal and fraudulent activities that Judge Kaplan found had taken place during the Lago Agrio proceedings.[6]  That DeLeon and his company provided vast sums of money to fund the Lago Agrio Action is not disputed.  What is at issue is whether DeLeon and his company are to be held accountable as a co-conspirators involved in the illegal activities undertaken by Donziger and others as part of a scheme to defraud Chevron out of its money.  Therefore, the court finds that Chevron's discovery requests propounded upon Snaider related to the funding of the variously identified CHEVRON LITIGATIONS are for use in foreign proceedings.

Concerning the *Intel* factors, although the Gibraltar court originally stated it would "keep a close eye on the proceedings in order to ensure that they are not abused, that unjustified fishing exercises are not allowed and that the matter does not escalate out of control," Justice Jack recently has held that some third party discovery, as noted *infra*, was "not a fishing expedition . . nor a 'roving inquisition'" and ordered that the relevant information about "Mr DeLeon's and Torvia's involvement with the Lago Agrio litigation [] was sufficient to fix [subpoenaed third party] with membership of the alleged conspiracy."  (Gibraltar Order ¶¶ 59, 64.)  Therefore, the information sought from Snaider, although he is not a participant in the foreign litigation, is not in circumvention of the foreign discovery restrictions and, in fact, appears welcomed by the court.  *Intel* factors (1) through (4), therefore, weigh in favor of allowing the Chevron's

---

[6] DeLeon was served with a copy of chevron's Petition in this case and, notably, filed no objections nor did he join in the motion to quash at issue.  (Trans. At 30.)

discovery regarding funding of the various litigation effort for the CHEVRON LITIGATIONS directed to non-party Snaider.[7]

      *Intel* factor number five dovetails with Fed. R. Civ. P. 26(b)(2)(C)(iii) requiring the court to examine whether "the burden or expense of the proposed discovery outweighs its likely benefit, considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues."

      Snaider claims he did not work in any capacity on the Lago Agrio Action until *after* the Ecuadorian Judgment was rendered; however he was involved in one or more transactions where DeLeon provided funds for litigation efforts.[8]  Pre-Ecuadorian Judgment documents are not apparently at issue with respect to Snaider's motion to quash, however.  Snaider states in his motion:

> Although Snaider believes Chevron already has the pre-Judgment documents relating to his contact with the Lago Agrio matter that are in his possession from its well-publicized discovery of Donziger, he has agreed to produce those documents to Chevron.

(Mot at 6.)

---

[7] At this stage the *Intel* factors cannot be fully analyzed with respect to the Enforcement Actions. None of the courts appear to have directly addressed whether foreign-obtained discovery is welcome; however, although Snaider is not a party to any of those cases, his involvement in instituting these litigations appears significant.  Therefore, consideration of *Intel* under the limited facts provided to this court does not lead to a conclusion that the discovery would be unwelcome or that it would interfere with the proceedings in a negative way.

[8] Snaider claims the only pre-Judgment "involvement" Chevron can muster is that Snaider re-connected by email his two law school classmates, Donziger and Gibraltar Defendant DeLeon when Snaider was living in Ecuador and Donziger mentioned that he was looking for funding for a documentary film and exchanging periodic emails with Donziger.  (*See* Doc. 2 at 12-14, Mot. at 5.)

Snaider claims his involvement in the issues affecting Chevron really began when he was hired as an attorney and litigation consultan—first for Gibraltar Defendant Torvia Limited, then, through Snaider's company, Nextant LLC—to provide advice to the LAPs providing advice regarding international aspects of the Ecuadorian Judgment, "particularly strategy regarding jurisdictions in which the Judgment might be enforced." (Mot. at 5.) Snaider asserts that, as a general matter, Chevron's requests for documents impose a substantial burden on him. He claims to have preserved approximately 11 gigabytes of information or 200,000 documents, which include approximately 35,000 files created after the Ecuadorian Judgment was entered. These would all have to be reviewed for both responsiveness and attorney-client privilege because he claims he was acting as an attorney and litigation consultant to "two sets of clients." (See Mot. at 19-23.) Additionally, Snaider claims that an initial scan reveals that about one-third of the documents are in Spanish, imposing an additional burden of translation for Snaider's legal counsel.

General assertions of undue burden and expense are insufficient alone to foreclose discovery; especially when, as here, the discovery is highly relevant to the issues faced by the party to foreign litigation. Snaider bears the burden to show that responding to the discovery requests at issue would be unduly burdensome. *Klesch & Co. v. Liberty Media Corp.,* 217 F.R.D. 517, 524 (D.Colo.2003). This burden can only be met by providing sufficient details or "a compelling showing of undue burden" to obviate the overwhelming preference for requiring that relevant discovery materials be exchanged. *Int'l Bhd. of Teamsters, Airline Div. v. Frontier Airlines, Inc.,* Case No. 11-cv-02007-MSK-KLM, 2012 WL 1801979, at *7 (D. Colo. May 16,

2012) (citing *Cartel Asset Mgmt. v. Ocwen Fin. Corp.,* Case No. 01–cv–01644–REB–CBS, 2010 WL 502721, at *15 (D. Colo. Feb. 8, 2010) (citing cases). )

Chevron finds itself in the unenviable position of having to defend, in foreign countries, against execution of a judgment which has already been found to be corrupt in the intensely litigated New York case. As mentioned, the Order of New York District Judge Kaplan spanned 320 pages. The LAPs are nonetheless taking that fraudulent and illegally obtained judgment to foreign countries for execution, apparently utilizing funds obtained with Snaider's help from DeLeon and others. It is Chevron's position in the Gibraltar case that DeLeon and his company are co-conspirators with Donziger and others in attempting to purvey a worldwide fraud by execution of the illegally obtained Ecuadorian Judgment.

Chevron argues that it is unclear that Snaider was acting as an attorney or a litigation consultant such that he would be entitled to claim any responsive documents are privileged. Moreover, Chevron asserts that in his papers, Snaider has not specified how many documents in his possession are potentially privileged, how long it would take to review and log those documents, or the cost that would be involved.[9] Ultimately, Chevron argues that even if some or many documents are privileged, this is not sufficient alone to entitle Snaider to dodge his duty of responding.

The court finds that the documents sought are not unnecessarily cumulative of other evidence in already obtained given the rulings against Chevron's discovery requests for Snaider documents and information in the NY RICO action. Chevron has proven in a United States

---

[9] At the hearing, Snaider claimed that document review would take approximately 300 hours. However, Snaider does not address the likelihood that in a case such as this computer-assisted review would no doubt be invoked, and while that is costly, it is much more efficient than assigning individuals to review a large volume of paperwork. (Trans. at 15.)

District Court that the Ecuadorian Judgment was obtained by fraud and corruption and in violation of RICO.  Its current Gibraltar Action asserts that it was not just the LAPs and their attorneys who were involved in procuring the corrupt judgment, but also the people who poured millions into funding the Ecuadorian litigation and defending the RICO action in New York, as well as those who are still funding the Enforcement Actions, who are also co-conspirators in illegal pursuit of Chevron's money.  The discovery requested from Snaider, although broad, has apparently not been ordered produced in any previous case in spite of what appears to be a substantial involvement of Snaider and Nextant, at the very least in the funding of the Enforcement Actions.  The Ecuadorian Judgment involves not millions of Chevron dollars, but rather billions of dollars, not even considering the millions spent on litigation in Ecuador, the United States, Gibraltar and jurisdictions in which enforcement actions have been filed with apparently more yet to come.  The court finds that the discovery sought is crucial to determine the knowledge held by the funders about the racketeering activity Judge Kaplan found led to the Ecuadorian Judgment.   Therefore, although there is recognized burden to Snaider associated with producing the requested documents, the burden does not outweigh the benefit of the discovery given the nature of the case and the amounts of money at stake.

Therefore, the Motion to Quash will be denied as to Request Nos. 18-21 and 24-26 .

**C.     Subpoena Request Nos. 28 and 29 -- Documents relating to Snaider's dealings with law firms representing plaintiffs in the Lago Agrio Action and in the Enforcement Actions.**

28. All DOCUMENTS related to the hiring, retention, payment of, or negotiation of any contract or agreement with any person to act on behalf of, advise, or consult with any of the LAGO AGRIO PLAINTIFF LAW FIRMS.

29. All COMMUNICATIONS between YOU and LAGO AGRIO PLAINTIFF LAW FIRMS related to the CHEVRON LITIGATIONS.

This court does not understand, and therefore does not expect Snaider to understand, what exactly is requested in Request No. 28.  At first glance it appears to request documents regarding the basis for Snaider's associations and work performed with respect to the CHEVRON LITIGATIONS.  In other words, to answer the question of who hired Snaider, to do what, in what case and how was he to be paid.  This information would be of substantial use to determine whether Snaider was acting as an attorney providing legal advice to any given party, or attorney representing a party, or instead in some other capacity.  However, the request does not actually ask for any agreements between Snaider and the Lago Agrio Plaintiff Law Firms.  It asks for any agreement or contract to hire "**any person**" to do anything for any of the Plaintiff Law Firms.  As such the request is so overbroad as to be unintelligible.  Further, given the scope of the Request, the court is unable to employ the logical tests as outlined herein to determine whether the information sought would be for use in a foreign proceeding, whether the information was compatible with the foreign proceedings and whether the information is cumulative or duplicative or whether the burden or expense of production is outweighed by the benefit of discovery.  The Motion to Quash, therefore, will be granted as to Request No. 28.

The court views Request No. 29 likewise to be impermissibly overbroad and not tailored or confined to a specific topic which the court can fully analyze under the tests applicable to assistance in aid of foreign litigation outlined herein.  Further, the request asks for documents concerning matters which must be reviewed by more than one attorney given that responsive documents will involve, by default, communications with attorneys who were or are actively representing the LAPs in one or more litigation efforts.

Because of the overbreadth of the request and the small potential for any new discoverable information, the Motion to Quash will be granted with respect to Request No. 29.

**D.      Subpoena Requests 30 and 31.   Communications between Snaider and the Lago Agrio Plaintiff Activists**

30. All COMMUNICATIONS between YOU and the LAGO AGRIO PLAINTIFF ACTIVISTS related to the CHEVRON LITIGATIONS.

31. Any DOCUMENTS related to the activities of the LAGO AGRIO PLAINTIFF ACTIVISTS related to the CHEVRON LITIGATIONS

Chevron defines the term LAGO AGRIO PLAINTIFF ACTIVISTS as "persons who plan, organize, fund, or carry out protests, rallies, media events, campaigns, or other activities intended to promote awareness of the LAGO AGRIO LITIGATION and related issues, including, but not limited to, Amazon Watch, Assembly of the Affected, Atossa Soltani, Kevin Koenig, Mitchell Anderson, Esperanza Martinez, Simeon Tegal, Michael Brune, Leila Salazar, Han Shan, Kevin Jon Heller, Rainforest Action Network, Acción Ecológica, Oil Watch, Trudie Styler, Daryl Hannah, Bianca Jagger, JOSHUA RIZACK, You Break It You Fix It, and the Yes Men." [Doc. No. 24-1 at ¶33.]

As noted by Chevron and confirmed by Snaider at the hearing (trans. at 22), these two requests are not part of his Motion to Quash.  Therefore, the court considers that these requests have been agreed upon and production, if any, will be governed either by agreement or will be subject to the original order of Judge Jackson.

E.   **Subpoena Request Nos. 3, 6-17, and 23.  Documents relating to alleged providers of services to plaintiffs or plaintiffs' law firms for the Lago Agrio Action and related litigation.**

3. All DOCUMENTS related to AMAZONIA RECOVERY LIMITED, including, but not limited to:
   a. All DOCUMENTS using or discussing the creation of any code names, alternate names, pseudonyms, nicknames or other naming conventions ("alternate names"), other than the legal name for AMAZONIA RECOVERY LIMITED;
   b. All DOCUMENTS related to the appointment of JULIAN JARVIS, Ermel Gabriel Chavez Parra, Luis Francisco Yanza Angamarca, and Pablo Estenio Fajardo Mendoza to the board of directors of AMAZONIA RECOVERY LIMITED;
   c. All DOCUMENTS and COMMUNICATIONS related to the membership, responsibilities and operations of the AMAZONIA RECOVERY LIMITED STEERING COMMITTEE;
   d. All accountings related to AMAZONIA RECOVERY LIMITED;
   e. All DOCUMENTS related to any shares, rights, title, or interest directly or indirectly in AMAZONIA RECOVERY LIMITED held by YOU at any time;
   f. All DOCUMENTS related to GT NOMINEES LIMITED, TORVIA, or any other shareholder in AMAZONIA RECOVERY LIMITED;
   g. All DOCUMENTS related to the true beneficial owners of the shares of AMAZONIA RECOVERY LIMITED;
   h. All DOCUMENTS related to all savings, checking, money market, brokerage or any other credit or debit accounts belonging to or held for the benefit of AMAZONIA RECOVERY LIMITED, operated by AMAZONIA RECOVERY LIMITED, controlled by AMAZONIA RECOVERY LIMITED or for which AMAZONIA RECOVERY LIMITED is a signatory;
   i. All DOCUMENTS related to any person, who financially supported or invested in, was asked to financially support or invest in, or who offered to financially support or invest in AMAZONIA RECOVERY LIMITED.

6. All COMMUNICATIONS related to AMAZONIA RECOVERY LIMITED, NEWCO, GT NOMINEES LIMITED, TORVIA, and/or TC PAYMENT SERVICES.
   a. All COMMUNICATIONS and/or DOCUMENTS related to JULIAN JARVIS's interest in the LAGO AGRIO JUDGMENT, whether direct or indirect;
   b. All COMMUNCATIONS related to JULIAN JARVIS's ownership and/or interest in AMAZONIA RECOVERY LIMITED, whether direct or indirect;
   c. All COMMUNCATIONS related to JULIAN JARVIS's ownership and/or interest in TORVIA, whether direct or indirect.

7. All COMMUNICATIONS with JOSHUA RIZACK and/or THE RISING GROUP related to the CHEVRON LITIGATIONS, including, but not limited to: (a) all COMMUNICATIONS related to AMAZONIA RECOVERY LIMITED, NEWCO, GT NOMINEES LIMITED, TORVIA, and/or TC PAYMENT SERVICES.

8. All DOCUMENTS and COMMUNICATIONS related to NEWCO.

9. All DOCUMENTS related to GCG HOLDINGS LIMITED or any representative of GCG HOLDINGS LIMITED related to the CHEVRON LITIGATIONS.

10. All DOCUMENTS related to GT NOMINEES LIMITED or any representative of GT NOMINEES LIMITED related to the CHEVRON LITIGATIONS, including, but not limited to: (a.-e.)

11. All DOCUMENTS related to GT FIDUCIARY SERVICES LIMITED or any representative of GT FIDUCIARY SERVICES LIMITED related to the CHEVRON LITIGATIONS.

12. All DOCUMENTS related to GRANT THORNTON HOLDINGS LIMITED or any representative of GRANT THORNTON HOLDINGS LIMITED related to the CHEVRON LITIGATIONS.

13. All DOCUMENTS related to KUDU HOLDING GROUP LIMITED or any representative of KUDU HOLDING GROUP LIMITED related to the CHEVRON LITIGATIONS.

14. All DOCUMENTS related to TC PAYMENT SERVICES or any representative of TC PAYMENT SERVICES related to the CHEVRON LITIGATIONS, including, but not limited to: (a.-c.).

15. All COMMUNICATIONS with H5, or any representative of H5, including, but not limited to, NICOLAS ECONOMOU, related to the CHEVRON LITIGATIONS.

16. All COMMUNICATIONS with any of the GRANT THORNTON ENTITIES or any representative of any of the GRANT THORNTON ENTITIES related to the CHEVRON LITIGATIONS.

17. All DOCUMENTS related to WOODSFORD or any representative of WOODSFORD related to the CHEVRON LITIGATIONS, including, but not limited to: (a.-d.)

23. All DOCUMENTS related to NEXTANT'S involvement in the LAGO AGRIO LITIGATIONS.

Snaider's Motion to Quash will be granted with respect to requests 7 through 13 and 15 through 17.  There has been no showing whatsoever by Chevron regarding the relevance of the

requests for documents about these specific entities.  Chevron has not linked any of the entities or persons to either Russell DeLeon or Torvia Limited, defendants in the Gibraltar case, or to Amazonia Recovery Limited.  The court is unaware of what, if any, role was played by the persons and companies mentioned and is completely unable to do a proper analysis of the request.  The requests appear to this court to constitute pure fishing expeditions.

Request No. 3 concerns Snaider's involvement with Amazonia Recovery, Inc. ("Amazonia").  Chevron claims that Snaider and one of his employees were "instrumental in creating the structure the conspirators are using to hold and distribute proceeds of the corrupt Ecuadorian Judgment, Amazonia Recovery Limited ("Amazonia"), a Gibraltar company controlled through a complex set of offshore entities."  (Pet. at 10.)  According to Chevron, the "sole purpose [of Amazonia] is to not only help fund the efforts of the Lago Agrio plaintiffs in procuring and enforcing the judgment but then distribute the proceeds of that fraudulent judgment to any and all people who might have an interest."  (Transcript of Proceedings October 27, 2014 ("Transcript" or "Trans.") [Doc. No. 32] at 25.)  In fact, Chevron's argument is that Amazonia's purpose is to "distribute the proceeds of an illegal activity"; to wit, the conspiracy to defraud Chevron by obtaining and executing up an illegal judgment.  (*Id*. at 45.)  According to Snaider, neither he, nor his company Nextant, is or ever has been a member of Amazonia Recovery Limited.  (*Id*.; Resp. at 11.)  Chevron asserts however – without objection from Snaider - that both DeLeon and Torvia Limited are indeed members of Amazonia.  (*Id*.)

Given the membership of Gibraltar Defendants DeLeon and Torvia Limited in Amazonia, a vehicle whose purported only reason to exist is to distribute proceeds from the Ecuadorian Judgment rendered in favor of the LAPs, information possessed by Snaider about the entity is

relevant to the Gibraltar litigation and therefore is sought for use in the foreign proceedings against Torvia Limited and DeLeon.  Both Torvia Limited and DeLeon are participants in the foreign litigationand and are participants in Amazonia, the entity set up by Snaider.  While the Gibraltar court has not yet weighed in on discovery concerning Amazonia, this court finds the activities of this entity to be as if not more relevant than TC Payment Services that Justice Jack has ruled on.

Evidence concerning Amazonia is not argued to be cumulative or even unnecessarily burdensome, except to the extent Snaider has argued that all the information he has regarding the CHEVRON LITIGATION is burdensome.  Having previously made findings regarding the balance and burden of production of discovery in this case, this court rejects the argument of undue burden with respect to production of documents concerning Snaider's communications with or about Amazonia.

Therefore, the Motion to Quash will be denied with respect to Request No. 3, except for subsection 3(f) from which GT NOMINEES will be eliminated.

Subpoena Request No. 14 seeks documents in Snaider's possession concerning TC Payment Services.  TC Payment Services, as noted *infra*, was itself the subject of third party discovery requests granted by the Gibraltar court and was described as an entity under the control of Gibraltar Defendant DeLeon.   TC Payment Services may be associated with the funding of efforts by the LAPs to enforce the Ecuadorian Judgment which Judge Kaplan found to be unenforceable as having been procured fraudulently.  Therefore, discovery about TC Payment Service is relevant under the broad auspices of Fed. R. Civ. P. 26 and Justice Jack's Gibraltar Order.  Discovery about TC Payment Services in the possession of Snaider is subject to

the same analysis as set forth more fully in Section B herein regarding discovery about the funding of what Chevron claims is a conspiratorial scheme to defraud it.

Therefore, the Motion to Quash will be denied with respect to Request No. 14.

For the same reasons, Snaider's Motion to Quash shall be denied as to Request No. 6 insofar as the request asks for communications Snaider may have had regarding or with Amazonia Recovery Limited, Gibraltar Defendant Torvia Limited and/or TC Payment Services on the same basis as set forth herein and in Section B.  The subpoena request is limited by its three sub-parts to communications with or about Julian Jarvis, [10] which cures it of an overbreadth argument.  However, the Motion to Quash is granted as to communications with NEWCO and GT NOMINEES LIMITED.

Request No. 23 seeks information about Nextant's involvement with the LAGO AGRIO LITIGATION.  The subpoena definition states:  "LAGO AGRIO LITIGATION means and refers to the case of *María Aguinda y Otros v. Chevron Corporation*, in the Provincial Court of Justice of Sucumbíos with Ecuador Case No. 002-2003, and any appeals and enforcement actions stemming therefrom."  (Resp, [Doc. No. 24-1] at ¶ 31.)  By the inclusion of the term "enforcement actions stemming therefrom," Chevron has made this request applicable to the Enforcement Actions.

As noted herein, Snaider has agreed to provide responses to all requests which seek information which is pre-Ecuadorian Judgment.  Therefore, Snaider will, without protest, respond to Request 23 and produce responsive documents concerning Nextant's involvement with the case prior to the issuance of the Ecuadorian Judgment.  The court will further require

---

[10] Section 3(c) of the Subpoena provides information, albeit indirectly, that Julian Jarvis was on the Board of Directors for Amazonia.

that Snaider produce responsive discovery about Nextant's involvement specifically with the *María Aguinda y Otros* case both pre- and post-judgment, which will include Snaider's involvement in the appellate process during that case.

In justification of the part of Request No. 23 directed at Nextant's involvement in "enforcement actions stemming therefrom," Chevron states, "Snaider is a founder and manager of Nextant LLC, a business consulting firm based in Houston, Texas" and "with additional offices in Seattle, Bogatá and Buenos Aires." (Pet. at 2, 19.) Chevron alleges "Snaider and the business he founded, Nextant LLC, were instrumental in procuring funds from DeLeon that were used to bribe a supposedly neutral court-appointed damages expert in the Lago Agrio litigation, who then submitted a ghostwritten report to the court opining that Chevron should be held liable for billions of dollars in damages." (*Id.*) Additionally, Chevron asserts that "[d]ocuments produced during the RICO trial show that Nextant was paid more than $1.3 million dollars between 2007 and 2013 for 'enforcement.'" (Pet. at 16.)

In the Enforcement Actions, to defend against enforcement of the Ecuadorian Judgment, Chevron must, among other things, convince the foreign courts that the Ecuadorian Judgment is unenforceable in the jurisdiction in which the Enforcement Action is filed because it was procured by fraud or other illegal means. It is Chevron's contention that the very filing of the Enforcement Actions constitutes overt acts in the alleged conspiracy to defraud Chevron.[11]

---

[11] Chevron asserts that numerous courts including the following have found at least *prima facie* evidence of crime or fraud in connection with the Ecuadorian Judgment: *See In re Application of Chevron Corp.*, 749 F. Supp. 2d 135, 140 (S.D.N.Y. 2010); *Chevron Corp. v. Salazar*, 275 F.R.D. 437, 455 (S.D.N.Y. 2011); *Chevron Corp. v. Weinberg Group*, Misc. No. 11-409 (JMF), at *5 (D.D.C. Sept. 8, 2011), *vacated on other grounds by Chevron Corp. v. Weinberg Group*, 682 F.3d 96 (D.C. Cir. 2012) (attached as Ex. 55); *In re Chevron Corp.*, 749 F. Supp. 2d 141, 144-45,167-168 (S.D.N.Y. 2010); *Chevron Corp. v. Champ*, Nos. 10-mc-00027 & 10-mc-00028,

Obviously, Chevron also continues to allege the same conspiratorial behavior in the Gibraltar Action.

Snaider states that the LAPs "hired Nextant as a litigation consultant to work on strategy and planning related to potential international enforcement actions and the proceeds of such actions." (Mot. at 6-7.) At some later point, Snaider claims that the LAPs "had Nextant help their Ecuadorian counsel track the complicated RICO case." (*Id.*) Nextant stopped working for the LAPs in mid-2013. (*Id.*) Snaider argues that the mere filing of actions in foreign locations seeking to enforce the Ecuadorian Judgment is not, in and of itself, illegal or improper. However, Snaider confesses in his Motion that Chevron's arguments in defense of the Enforcement Actions—namely, that the Ecuadorian Judgment was procured by fraud—renders relevant the particulars of the fraud which was allegedly perpetrated in that action. (Mot. at 26.) Without opining on whether the filing of the Enforcement Actions are conspiratorial overt acts or merely legitimate filings allowed under foreign law, based on Snaider's characterization of Nextant's role working on strategy and planning related to international enforcement of the Ecuadorian Judgment, Nextant's activities are relevant to Chevron's defense of the Enforcement Actions and therefore the requests are for use in foreign proceedings.[12]

From the statements in Snaider's Motion, it appears that Nextant, at least in part, worked for the LAPs on issues that would not be uniformly subject to privilege. "Not every document drafted by counsel or every communication with counsel is protected by the attorney-client

---

2010 WL 3418394, at *6 (W.D.N.C. Aug. 30, 2010); *In re Application of Chevron Corp.*, No. 10cv1146-IEG (WMC), 2010 WL 3584520, at *6 (S.D. Cal. Sept. 10, 2010); *In re Application of Chevron Corp.* ("Kamp 1782"), Civil Nos. 10-MC- 21JH/LFG, 10–MC–22 J/LFG., 2010 WL 9545704 (D.N.M. Sept. 13, 2010). (See Pet. at 15, n. 5.)

[12] As noted, application of the *Intel* factors with respect to the Enforcement Actions in inconclusive at this time.

privilege." *Hurtado v. Passmore & Sons, L.L.C.*, Case No. 10–cv–00625–MSK–KLM, 2011 WL 2533698, at *4 (D. Colo. June 27, 2011) (citing *Nat'l Farmers Union Prop. & Cas. Co. v. Dist. Court*, 718 P.2d 1044, 1049 (Colo.1986)).  If Nextant, a non-lawyer, was hired as a litigation consultant, its work could be subject to the protection of the work product privilege. Work-product immunity derives from the provisions of Fed. R. Civ. P. 26(b)(3), which provides that, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative.   But those materials may be discovered if they are otherwise discoverable under Rule 26(b)(1) and "the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." *Id.  See also American Banker's Ins. Co. of Fla. v. Colo. Flying Academy, Inc.*, 97 F.R.D. 515, 516 n.1 (D. Colo. 1983) (noting that Rule 26(b)(3) codifies the work product doctrine recognized in *Hickman v. Taylor*, 329 U.S. 495 (1947)).  Fact, or non-attorney opinion work-product may be obtained by a third party who satisfies the "substantial need/undue burden test" by demonstrating (1) a substantial need for the material and (2) an inability to develop the information otherwise without undue hardship. *Frontier Refining Inc. v. Gorman-Rupp Company, Inc.*, 136 F.3d 695, 702-03 (10th Cir. 1998). Additionally, of course, under Chevron's theory, Nextant's work product, if any, could be subject to the crime/fraud exception previously addressed.

Just because some responsive documents might be privileged does not mean that otherwise legitimate discovery should not be allowed.  *Cf. Spacecon Speciality Contractors, LLC v. Bensinger*, Case No. 09-cv-02080-REB-KLM, 2010 WL 3927783, at * 5 (D. Colo. Oct. 1,

2010).  If Nextant or Snaider deem documents responsive to this request as privileged, these documents will be duly noted on a sufficient privilege log.

Further, contrary to Snaider's assertion of unreasonable burden, the request does not seek disclosure of every document ever generated which affects or relates to the Enforcement Actions. The request seeks only production of documents where Nextant was "involved" in the activity and requires production of documents which are in the possession of Snaider and/or Nextant. From the information provided to this court, while Chevron has been able to obtain discovery "unique in the annals of American judicial history" through proceedings pursuant to 28 U.S.C. § 1782, *Chevron Corp. v. Naranjo*, 667 F.3d 232, 236 (2d Cir. 2012) (quoting *In re Chevron Corp.*, 650 F.3d 276, 282 n.7 (3d Cir. 2011)), it appears that discovery directly from Snaider and Nextant has managed to slip the discovery noose.  Therefore, the discovery requested is not cumulative or duplicative or available from a more convenient source.  Further, as analyzed in more detail in Section B, *infra*, although production may be a burden for Snaider and Nextant, that burden does not outweigh the benefit to Chevron of receiving the discovery, given the size and scope of the proceedings.

Therefore, the Motion to Quash is denied in its entirety as to Request No. 23.

**F.      Subpoena Request No. 27 – Documents Relating to Alleged Misconduct in the Lago Agrio Action**

27. All DOCUMENTS related to the proposing, writing, drafting, creation, editing, advance knowledge, or revision of any judgment, order, statement, ruling, report, or other writing related to the LAGO AGRIO LITIGATION and issued by the LAGO AGRIO COURT, including all DOCUMENTS related to the provision of any DOCUMENT that is not part of the RECORD to any person for use in the drafting or preparation of any such judgment, order, statement, ruling, report, or other writing, including, but not limited to, the FUSION MEMO, the MOODIE MEMO, the SELVA VIVA RECORD SUMMARY, the SELVA VIVA DATABASES, the TRUST E-MAIL, and the DRAFT ALEGATO.

Although, as discussed in connection with Section E *infra*, the "Lago Agrio Litigation" has been defined by Chevron to include "enforcement actions stemming" from *María Aguinda y Otros v. Chevron Corporation*, that phrase is rendered moot with respect to Request No. 27. The Request seeks only documents which relate to a "judgment, order, statement, ruling, report, or other writing" which was "issued by the LAGO AGRIO COURT." [13] Therefore, the request limits itself to documents related to the *Aguinda* case and its court appeals.

Snaider characterizes this request as "documents related to Cabrera" and admits that the request is for use in a foreign proceeding given "Chevron's arguments in the Foreign Proceedings [that] the alleged fraud by which the LAPs procured the Judgment" is one of Chevron's defenses. (Mot. at 26.) Snaider argues against production, however, on the basis of the *Intel* factors and Fed. R. Civ. P. 45 and 26 that the request calls for evidence that is cumulative of the extensive discovery already obtained in the Ecuadorian and RICO Actions. Snaider argues that the Request is "a fishing for evidence to sue Snaider." (Mot. at 27.)

Chevron admits that in the NY RICO case, "Both the LAPs and Donziger were required to produce documents related to Snaider and Nextant." (Resp. at 14 n.13, referencing *Chevron*

---

[13] Defined by Chevron as "LAGO AGRIO COURT" means and refers to the Provincial Court of Justice of Sucumbíos in Lago Agrio, Ecuador."

*Corp. v. Donziger*, 11 Civ. 0691 (S.D.N.Y. Jan. 9, 2013). That discovery in the NY RICO action was only provided up to February 14, 2011, however. Chevron argues that the foreign actions are not just about enforcing and executing upon the fraudulent Ecuadorian trial court judgment, which was a primary focus of the NY RICO case, but that now the LAPs are also mounting an effort to enforce the Ecuadorian appellate order which modified the Ecuadorian Judgment. In support of that argument, Chevron asserts the LAPs are arguing that the Ecuadorian appeal "cleansed" misconduct during the trial, rendering at least the appellate order enforceable in spite of the fraud found by the NY RICO court in the trial-court stage of the proceeding. (*Id.*)

Given the status of the Lago Agrio Action at the time the court ordered discovery about Snaider and Nextant and the subsequent events in all the litigations, the court finds that the requests that contained in Request 27 is not so cumulative as to require the Request be quashed. While there may be some overlap in production of responsive documents, neither Snaider nor Nextant has ever been required to produce documents they possess in any of the cases and the document relating to Snaider and Nextant that were produced by other litigants were limited in time and/or scope.

Snaider's Motion to Quash is therefore denied with respect to Request No. 27.

## G.   Subpoena Request No. 22 – Snaider and Nextant's Compensation

22. All DOCUMENTS related to any payment, compensation, revenue, or any other thing of value YOU have received, been offered, contracted to receive, have been promised, or expect to receive related to YOUR involvement in, or work related to, the CHEVRON LITIGATIONS.

Chevron asserts that Snaider's, or perhaps more precisely Nextant's, compensation is relevant to "the LAPs' financial status, their ability to generate funds to continue their extortionate campaign against Chevron, and the diversion of any potential enforcement proceeds

to third-party beneficiaries—all of which the LAPs call into question in the enforcement

proceedings." (Resp. at 10.) As a basis for this broad statement, Chevron asserts that the LAPs

have denied receiving financial support and moved to proceed *in forma pauperis* in the

Enforcement Actions, which motions are opposed by Chevron. (*Id*.) Chevron claims that

information regarding Snaider's compensation, including the source and scale of payments made

to him, will be relevant to this issue. This court finds this argument is less than compelling and

fails to justify a finding that information about Snaider and Nextant's compensation is for "use in

a foreign proceeding." There are many "more convenient, less burdensome, [and] less

expensive" ways to get evidence of the LAPs' financial status than to force Snaider and Nextant

to disclose the compensation they received over the many years of involvement in the Chevron

litigation; methods which would constitute better evidence to support a claim that the LAPs are

not deserving of *in forma pauperis* standing. Fed. R. Civ. P. 26(b)(2)(C)(i).

This court also finds that this Request has been propounded to harass and intimidate

Snaider in violation of Fed. R. Civ. P. 26 and is a fishing expedition designed to set up a future

claim against Snaider. Evidence that Snaider, allegedly like many members of the LAP

litigation team, possesses a stake in the judgment is only of extremely marginal relevance to

Chevron's defense in the Enforcement Actions. *See* Fed. R. Civ. P. 26(c) (court may "protect a

. . . person from annoyance, embarrassment, [or] oppression"); *General Steel Domestic Sales,*

*LLC v. Chumley*, Case No. 13-cv-769-MSK-KMT, 2014 WL 3057496, at *3 (D. Colo. July 7,

2014) (motion to quash non-party discovery granted when information sought was "overbroad,

irrelevant, unnecessary, and was a fishing expedition designed to gain information . . . not for

purposes of [the] litigation").  Since Snaider is not currently accused of being a co-conspirator in the Gibraltar Action, this information is likewise irrelevant there.

Snaider's Motion to Quash is granted as to Request No. 22.

In summation, it is **ORDERED**

Respondent Andres Snaider's ("Snaider") "Motion to Modify *Ex Parte* Order and Partially Quash Subpoena under 28 U.S.C. § 1782, or in the Alternative, for a Protective Order under Fed. R. Civ. P. 26(c)."  [Doc. No. 21] is GRANTED in part and DENIED in part as follows:

1.      The Motion is GRANTED with respect to subpoenaed Requests No. 6 (in part),7, 8, 9, 10, 11, 12, 13, 15, 16, 17, 22, 28 and 29.

2.      The Motion is DENIED with respect to subpoenaed Requests No. 1, 2, 3 (as modified), 4, 5, 6 (in part), 14, 18, 19, 20,21,23, 24, 25, 26 and 27.

DATED this 15th day of January, 2015.

BY THE COURT:

Kathleen M. Tafoya
United States Magistrate Judge